Joe AULSTON and Lola Aulston, et al.,
Plaintiffs–Appellants,

v.

UNITED STATES of America, et al.,
Defendants–Appellees,

and

Shell Western E & P, et al.,
Intervenors–Appellees.

No. 88–2349.

United States Court of Appeals,
Tenth Circuit.

Sept. 20, 1990.

Robert H. Bork, Washington, D.C. (Luke J. Danielson, Denver, Colo., and Stephen Muse, San Antonio, Tex., with him, on briefs), for plaintiffs-appellants.

George W. Van Cleve (Michael J. Norton, Acting U.S. Atty. and Paula M. Ray, Asst.

U.S. Atty., Denver, Colo., with him, on brief), for defendants-appellees.

Marla J. Williams (Steven B. Richardson with her, on brief), Holme Roberts & Owen, Denver, Colo., for intervenors-appellees.

Before HOLLOWAY, Chief Judge, and SEYMOUR and MOORE, Circuit Judges.

SEYMOUR, Circuit Judge.

This case presents us with the question whether oil and gas reservations to the United States in federal land patents pursuant to the Agricultural Entry Act of 1914, 30 U.S.C. §§ 121–125 (1988) (1914 Act), include deposits of carbon dioxide gas. The Department of the Interior and the district court concluded that the carbon dioxide gas was reserved to the government. We agree and hold that the term "gas" in the 1914 Act reasonably may be interpreted to include the carbon dioxide deposits.

## I.

### A.

Plaintiffs are owners of ranchlands and dryland farms in Montezuma and Dolores Counties in the State of Colorado. Underlying or adjacent to these lands are portions of the McElmo Dome, a geologic formation containing a large amount of nearly pure carbon dioxide, which is an inert, noncombustible, odorless gas at normal temperature and pressure conditions. The gas was discovered in the Dome in the 1950s. Although of little or no commercial value for decades,[1] the combination of the domestic oil shortages of the 1970s and the resultant development of tertiary oil recovery methods employing carbon dioxide suddenly transformed the gas into a valuable resource. Since 1982, carbon dioxide gas has been pumped from plaintiffs' lands by private oil companies under a leasing arrangement with the United States government. The gas is transported by pipeline to otherwise depleted oil fields in Texas, where it is used both as a pressurizer and a solvent to enhance oil recovery there.

The United States' claim to ownership of the carbon dioxide gas derives from reservations to the United States of "oil and gas" or "oil, gas, potash and sodium" contained in plaintiffs' or their predecessors' federal land patents issued under the homestead laws. The reservations at issue were created pursuant to the Agricultural Entry Act of 1914, ch. 142, 38 Stat. 509 (codified as amended at 30 U.S.C. §§ 121–125 (1988)) (1914 Act). The 1914 Act provided for homestead entry onto lands withdrawn from entry, classified, or reported as valuable for "phosphate, nitrate, potash, oil, gas, or asphaltic minerals," subject to reservations to the United States of the enumerated resources "on account of which the lands were withdrawn or classified or reported as valuable." *Id.* § 121. Plaintiffs claim that the term "gas" in the 1914 Act and in the patents refers to combustible hydrocarbon gas only.

To gain a proper understanding of the statute at issue, we must put it into its historical context. As is true for much of the West, plaintiffs' lands originally comprised part of a vast public domain. In the second half of the nineteenth century, Congress enacted homestead laws to encourage settlement and agricultural development of these immense stretches of land. *See, e.g.,* Homestead Act of 1862, ch. 75, 12 Stat. 392 (codified as amended at 43 U.S.C. §§ 161–302 (1982)), *repealed by* Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, 90 Stat. 2787.

Settlement occurred at a rapid pace and full fee title to much of this land passed into private hands. In the conservation-minded, Progressivist era of the first few decades of the twentieth century, the concern arose that valuable resources in the public domain should remain in public hands to avoid imprudent development, add to public revenues, and avert the threat of monopolization. *See generally* Colby, *The*

---

1. In the 1930s, carbon dioxide gas had a limited commercial value in the making of dry ice for refrigeration.

*New Public Land Policy with Special Reference to Oil Lands,* 3 Cal.L.Rev. 269 (1915). In particular, the homestead entry laws were viewed as subject to abuse by speculators interested only in the mineral resources underlying them. *See The Classification of the Public Lands,* 537 USGS Bull. 38–39, Dep't of the Interior (1913) (Bulletin 537). Presumably for fear of the consequences of legislative delay, the Department of the Interior unilaterally withdrew from homestead entry millions of acres believed to contain oil, gas, phosphate, or coal. *See id.* at 38–43; *see also United States v. Midwest Oil Co.,* 236 U.S. 459, 478–79, 35 S.Ct. 309, 315, 59 L.Ed. 673 (1915) (describing executive land withdrawals).

In 1910, Congress recognized the executive's authority to make land withdrawals and provided a procedure by which the Department of the Interior could withdraw any public lands and reserve them for the public purpose set forth in the withdrawal order. *See* Pickett Act of 1910, ch. 421, 36 Stat. 847 (codified as amended at 43 U.S.C. §§ 141–142 (1970)), *repealed by* Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, 90 Stat. 2792; *see also Midwest Oil Co.,* 236 U.S. at 482–83, 35 S.Ct. at 316–17 (validating executive withdrawals and discussing purpose and effect of Pickett Act). The Pickett Act withdrawals were only partial, however. When originally enacted, the Act provided that lands so withdrawn would remain open for development and purchase of "minerals *other than* coal, oil, gas and phosphates." Ch. 421, 36 Stat. 847. In 1912, Congress amended the Pickett Act and replaced this list of excluded minerals with a provision allowing exploration and purchase of metalliferous minerals on withdrawn lands. *See* Act of August 24, 1912, ch. 369, 37 Stat. 497. Under the Pickett Act, the Department of the Interior continued with its policy of withdrawing vast quantities of land it believed valuable for petroleum (including gas), phosphate, potash, waterpower, coal, and other nonmetalliferous miner-

als. *See* Letters from the Secretary of the Interior to Congress (Dec. 13, 1912 and December 16, 1913) (Report on Land Withdrawals from Settlement, Location, Sale, or Entry under Provisions of the Act of Congress Approved June 25, 1910, 36 Stat. 847).

In addition to the Pickett Act land withdrawals, the United States Geological Survey (USGS) embarked on a large-scale program of classification of the public lands according to their mineral, hydrologic, and agricultural characteristics. *See generally* Bulletin 537. Under the USGS system then in use, mineral lands could be classified as coal lands, oil and gas lands, potash lands, or phosphate lands, among other minerals. *See id.* Concerning oil and gas, the Survey noted:

> "The immediate purpose of the classification of oil and gas land is to withhold from entry all lands containing valuable deposits of fluid hydrocarbons pending the enactment of adequate legislation providing for their disposition. The ultimate purpose of the classification is to determine the position and extent of the areas whose value for their deposits of oil or gas, whether proved by actual drilling or indicated by favorable geologic conditions, is greater than their value for agriculture or other purposes and to provide for a disposition of the deposits in accordance with this greater value."

*Id.* at 117. Once land was so classified, a proposed withdrawal order would be sent to the Secretary of the Interior for appropriate action.[2]

In the wake of these large-scale withdrawals, it was evident that valuable farm or ranch lands would go untilled or ungrazed because they were withdrawn from entry on account of the valuable deposits believed to exist there. Congress responded with a series of acts, including the 1914 Act, permitting homestead entry onto such lands while reserving various types of mineral estates in the United States. *See, e.g.,* Act of March 3, 1909, ch. 270, 35 Stat. 844

---

**2.** The Pickett Act also authorized withdrawals to allow time for classification of lands. *See* ch. 421, 36 Stat. 847.

(codified at 30 U.S.C. § 81 (1988)) (reserving coal); Act of August 24, 1912, ch. 367, 37 Stat. 496, *repealed by* Act of December 16, 1930, ch. 14, 46 Stat. 1028 (reserving enumerated mineral resources in land patents issued in Utah); 1914 Act (authorizing reservations of phosphate, nitrate, potash, oil, gas, and asphaltic minerals); Stock Raising Homestead Act of December 29, 1916, ch. 9, 39 Stat. 864 (codified at 43 U.S.C. § 299 (1982)) (reserving "coal and other minerals"); *see generally* Bate, *Mineral Exceptions and Reservations in Federal Public Land Patents*, 17 Rocky Mtn. Min.L.Inst. 325, 345–50 (1972).

Plaintiffs' or their predecessors' patents contain reservations of "oil and gas" or "oil, gas, potash and sodium"[3] pursuant to the 1914 Act. A typical patent grants the land to the homestead claimant

"EXCEPTING AND RESERVING TO THE UNITED STATES all oil and gas in the lands so patented, and to it, or persons authorized by it, the right to prospect for, mine and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the [1914 Act]."

Rec., vol. II, at 2. The relevant portions of the 1914 Act in turn provide:

"Lands withdrawn or classified as phosphate, nitrate, potash, oil, *gas*, or asphaltic minerals, or which are valuable for these deposits, shall be subject to appropriation, location, selection, entry, or purchase, if otherwise available, under the nonmineral land laws of the United States, whenever such location, selection, entry, or purchase shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable, together with the right to prospect for, mine, and remove the same."

30 U.S.C. § 121 (1988) (emphasis added).

Section 2 of the 1914 Act specifies that any deposits so reserved "shall be subject to disposal by the United States ... as shall be hereafter expressly directed by law." *Id.* § 122. Six years later, Congress provided for the disposal of the reserved deposits in the Mineral Lands Leasing Act of 1920, ch. 85, 41 Stat. 437 (codified as amended at 30 U.S.C. §§ 181–263 (1988)). The Mineral Lands Leasing Act provided the Department of the Interior with authority to lease deposits of coal, phosphate, oil shale, oil, gas, and sodium owned by the United States. Significantly, the Mineral Lands Leasing Act expressly excepted helium from its provisions regulating the leasing of "gas" rights. *See id.* § 181. Under various versions of this Act, the United States has leased its gas rights in hydrocarbons and in carbon dioxide, including the carbon dioxide at issue here, to various private concerns.

### B.

In the late 1970s, after the carbon dioxide in the McElmo Dome was discovered and its value in oil production became apparent, various plaintiffs sought the Department of the Interior's determination as to who owned it. The Department asserted that the deposits were "gas" within the meaning of the reservations in plaintiffs' patents under the 1914 Act. *See* rec., vol. II, at 201–03 (Memorandum from the Regional Solicitor, Denver, Department of the Interior, to the State Director of the Bureau of Land Management (July 12, 1979)). Plaintiffs responded with a class action in the United States District Court for the District of Colorado challenging the Interior Department's assertion of ownership of the carbon dioxide, and seeking compensation under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2) (1988).

The district court dismissed the class action. The attack on the Interior Department's determination of ownership was ruled unripe because plaintiffs had failed to exhaust their administrative remedies by bringing an administrative appeal before the Interior Board of Land Appeals (IBLA). *See* 43 C.F.R. § 3000.4 (1989). The district court also held it lacked jurisdiction over

---

**3.** In 1933, the 1914 Act was amended to include reservations of sodium and sulphur. *See* Act of Mar. 4, 1933, ch. 278, 47 Stat. 1570 (codified at 30 U.S.C. § 124 (1988)).

the Tucker Act claim because it exceeded $10,000. *See* 28 U.S.C. § 1346(a)(2). The court observed that claims against the United States exceeding $10,000 must be brought in the Claims Court under 28 U.S.C. § 1491 (1988). *See Ives v. United States,* Civ. No. 80–K–705 (D.Colo. March 25, 1981).

Plaintiffs returned to the administrative arena. Following the district court's suggestion, plaintiffs filed a private contest action against the Department of the Interior which was dismissed because the United States is not a proper defendant in such actions. *See* 43 C.F.R. § 4.450 (1989). The Department suggested that plaintiffs file an application for a recordable disclaimer of interest, under which the FLPMA authorizes the Interior Department to issue a sort of quitclaim deed to clear title to real property in which the United States may have a colorable but invalid interest. *See* 43 U.S.C. § 1745 (1982); 43 C.F.R. §§ 1864.0–1 to .4 (1989). Plaintiffs filed their application, which the Department denied. The Department's decisions were appealed to the IBLA pursuant to 43 C.F.R. § 1864.4, and the IBLA affirmed. *See Robert D. Lanier,* 93 Interior Dec. 66 (1986); *Norton,* I.B.L.A. 88–22 (Nov. 27, 1987).

Plaintiffs sought review of the IBLA's decision, in conjunction with their damages claim, in the United States Claims Court. The Claims Court concluded, however, that it had no jurisdiction to set aside the IBLA's decision. The court's inability to determine ownership of the carbon dioxide also precluded consideration of plaintiffs' Tucker Act claim because plaintiffs' ownership of the gas is an obvious predicate to the validity of their damage claim. The Claims Court therefore dismissed the action. *See Aulston v. United States,* 11 Cl.Ct. 58 (1986).

On appeal, the Federal Circuit affirmed. The court realized, however, that substan-tial time had already elapsed in administrative and judicial forums and that plaintiffs had yet to seek review of the IBLA's decision in the proper forum. By the time their ownership would be finally determined, the statute of limitations on their damage claim would likely run. The court therefore vacated the dismissal of plaintiffs' claim for damages, directing that the action be stayed pending resolution of the ownership issue. *See Aulston v. United States,* 823 F.2d 510, 514 (Fed.Cir.1987).

Plaintiffs returned to the Federal District Court in Colorado to seek review of the IBLA's decision, and the district court affirmed the IBLA. *See Aulston v. United States,* No. 87–F–1144 (D.Colo. Aug. 4, 1988). Plaintiffs appealed.

**II.**

█ Our appellate jurisdiction to review a final order of the district court is based on 28 U.S.C. § 1291 (1988). Plaintiffs brought their action under 43 U.S.C. § 1745 (1982), and appealed to the IBLA pursuant to 43 C.F.R. § 1964.4 (1989). The district court's jurisdiction to review IBLA decisions derives from 28 U.S.C. § 1331 (1988) read in conjunction with 5 U.S.C. §§ 701–706 (1988).[4]

█ On appeal from a district court's review of an agency decision, " 'the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference.' " *Webb v. Hodel,* 878 F.2d 1252, 1254 (10th Cir.1989) (quoting *Brown v. United States Dep't of the Interior,* 679 F.2d 747, 748–49 (8th Cir.1982)). Recently, the Supreme Court has reiterated the analysis a court undertakes when it reviews the validity of an agency's interpretation of a statute the agency is charged with administering:

"We first ask 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear,

---

**4.** Intervenors assert that this action is time-barred under the statute of limitations contained in 30 U.S.C. § 226–2 (1988). This limitation does not apply to actions under the FLPMA, but rather to the validity of lease permits issued pursuant to the Mineral Lands Leas-ing Act, 30 U.S.C. §§ 181–263 (1988). *See Park County Resource Council v. United States Dep't of Agric.,* 817 F.2d 609, 616 (10th Cir.1987) (30 U.S.C. § 226–2 applies to actions contesting agency decisions made under the Mineral Lands Leasing Act).

that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' 'In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute,' that is, whether the agency's construction is 'rational and consistent with the statute.'" *Sullivan v. Everhart*, —— U.S. ——, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (citations omitted). However, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984).

### III.

### A.

■■■ In interpreting statutes, we begin with the relevant language. When the terms of a statute are unambiguous, our inquiry is complete, except in rare and exceptional circumstances. *See Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981). In interpreting the relevant language, however, we look to the provisions of the whole law, and to its object and policy. *See Dole v. United Steelworkers*, —— U.S. ——, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990).

■■■ The 1914 Act creates power in the federal government to reserve the named resources in federal patents for "[l]ands withdrawn or classified as phosphate, nitrate, potash, oil, *gas*, or asphaltic minerals, or which are valuable for those deposits." 30 U.S.C. § 121 (emphasis added). The operative word "gas" has numerous meanings in common speech,[5] in the natural sciences, and in various legal and industrial contexts. Congress' employment of the word in a statute creating power to reserve natural resource rights indicates that "gas" should be understood to mean a natural resource in the legal and technical context of its commercial exploitation. Even within this context, however, the word "gas" has meanings supporting both sides of this dispute.[6]

Plaintiffs vigorously maintain that the structure of the relevant language of the

---

**5.** A typical dictionary definition of gas reads: "1: a fluid (as air) that has neither independent shape nor volume but tends to expand indefinitely ... 2a: a gas or gaseous mixture with the exception of atmospheric air—not used scientifically b: a gas or gaseous mixture (as laughing gas or ethylene) used to produce anesthesia c: a combustible gaseous mixture (as for fuel or illumination) ... 3 *slang:* empty boasting talk ... 4: the state of having or an accumulation of gas in the digestive tract; *also:* distress caused by this 5: a substance (as a war gas or tear gas) whether gaseous, liquid, or solid under ordinary conditions that can be used to produce a poisonous, asphyxiating or irritant atmosphere ... 6a: gasoline b: the accelerator of a gasoline powered vehicle...." *Webster's Third New Int'l Dictionary* 937 (1981).

**6.** A widely used manual of oil and gas law contains numerous definitions of the word gas. The first two are:
"'Any fluid, either combustible or noncombustible, which is produced in a natural state from the earth and which maintains a gasous or rarefied state at ordinary temperature and pressure conditions.' 30 C.F.R. § 221.2(*o*)

(1980). In the oil and gas industries, it means natural gas.
"'Twenty-three states define gas as all natural gas, including casinghead gas, and all hydrocarbons not defined as oil. Generally, the remaining states describe the definition of a gas well but do not specifically define natural gas.' 26 *Oil & Gas Compact Bull.* 55 (June 1967)."
8 H. Williams and C. Meyers, *Oil & Gas Law, Manual of Terms* 389 (1987).
The term "natural gas" also has various definitions within the industry:
"Hydrocarbons which at atmospheric conditions of temperature and pressure are in a gaseous phase."
*Id.* at 588.
Nonetheless, one commentator writes:
"'The ordinary rarefied or gaseous hydrocarbons found in the earth are referred to generally as "natural gas." Non-combustible natural gases occurring in the earth, such as *carbon dioxide*, hydrogen sulfide, helium and nitrogen, are generally referred to by their proper chemical names. *Often, however, noncombustible gases are found in combination*

1914 Act reflects a clear intent to reserve only hydrocarbon gas and to convey all other gas in the land patent. In the 1914 Act, the word "gas" appears sandwiched between "oil" and "asphaltic minerals," assertedly two "fuel minerals,"[7] and after a listing of phosphate, nitrate, and potash, assertedly three "fertilizer minerals." It would make no sense, plaintiffs argue, for the drafter to insert "gas" within a grouping of fuel minerals if the word was intended to refer to noncombustible gases such as carbon dioxide. According to plaintiffs, Congress intended the courts to apply the principles of ejusdem generis[8] to limit the term "gas" to hydrocarbon gas.

This structural argument overwhelmingly supports the proposition that gas indirectly or directly valuable for fuel was intended to be reserved. Plaintiffs would have us infer, however, that Congress actually considered the combustible and noncombustible components of naturally occurring underground gas and expressed its intent to reserve only combustible gas by its choice of the sequence in which the reserved minerals were listed. This proposed interpretation immediately prompts us to ask why Congress did not merely reserve "fuel gas" in lieu of relying on ejusdem generis. The manipulability of the rule was well-recognized even during the era of the 1914 Act:

> with combustible gases and the mixture is referred to generally as "natural gas," without any attempt to distinguish between the combustible and non-combustible gases.'"

*Id.* (quoting Pruitt, *Mineral Terms—Some Problems in Their Use and Definition,* 11 Rocky Mtn. Min.L.Inst. 1, 16 (1966)) (emphasis added). In 1921, the United States Geological Survey considered "natural gas" to be a "mechanical mixture" of various hydrocarbons and nonhydrocarbon gaseous constituents. *See Helium Bearing Natural Gas,* 86 USGS Bull. 36, Dep't. of the Interior (1921).

**7.** The phrase "fuel mineral" appears nowhere in the 1914 Act. Various executive officials referred to reservations of "fuel minerals" in the 1914 Act. *See infra* at 592.

**8.** Ejusdem generis is an intrinsic aid to statutory construction. "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enu-

"If we should apply the rule of ejusdem generis, what qualities or peculiarities of the specified type 'coal,' shall be considered in determining the classification intended by the use of the word 'mineral'? Are we to classify according to value? If so, can it be said that oil or gas on the one hand and coal on the other are of different kinds or species of minerals? If we classify as to use, is it not true that all three are used for fuel? Shall the classification be determined by the form, density, color, weight, value or uses of the particular species mentioned? Taking either value, use, or nature or origin as the basis of the classification mentioned, can we say that oil and coal do not belong to the same class? ... Such evident difficulty in applying the rule of *ejusdem generis* to the terms of the reservation under consideration renders it an unsafe guide, and we do not believe any aid in the interpretation of the terms used in the reservation will be afforded by such rule."

*Luse v. Boatman,* 217 S.W. 1096, 1099 (Tex.Civ.App.1919).

Indeed, no clear indication exists what classification method Congress would have intended the reader to use. The six enumerated substances constitute one class if the class is defined as "nonmetalliferous minerals." Plaintiffs' suggested subclasses of fuel and fertilizer minerals is another possibility.[9] Representative Scott Ferris,

merated by the preceding specific words." 2A N. Singer, *Sutherland Statutory Construction* § 47.17 (1984) (footnote omitted).

**9.** This argument is undermined by the judicial rejection of the characterization of "oil" as a specific word. In *Brennan v. Udall,* 251 F.Supp. 12 (D.Colo.1966), *aff'd,* 379 F.2d 803 (10th Cir.), *cert. denied,* 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967), for example, the word "oil" in the 1914 Act was construed to include oil shale, a solid sedimentary rock containing kerogen rather than petroleum. *See also Northern Natural Gas Co. v. Grounds,* 441 F.2d 704, 711 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971) (rejecting characterization of "oil" as specific term operating to limit definition of "gas" in lease to combustible gas only); *Navajo Tribe of Indians v. United States,* 364 F.2d 320, 327, 176 Ct.Cl. 502 (1966) (refusing to apply *ejusdem generis* to "oil and gas").

the Chairman of the House Committee on the Public Lands in 1914, appeared to have thought that each enumeration may have constituted a separate "class" of minerals. *See* infra at 593. The choice of class thus seems to depend primarily on the interpretive result one wants to reach, rather than on a clear indication of congressional intent.

Moreover, in *Northern Natural Gas Co. v. Grounds,* 441 F.2d 704, 711 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971), we rejected the application of ejusdem generis in construing an oil and gas lease. Indeed, the rule of ejusdem generis has had "little application in cases dealing with oil and gas." R. Hemingway, *Law of Oil & Gas* 4–5 (West 1983 2d ed.). We conclude that the text of the 1914 Act gives no indication whether Congress intended to prevent carbon dioxide gas from passing to the patentee.

### B.

We next address plaintiffs' historical analysis of the circumstances surrounding the enactment of the 1914 Act and related acts, employing materials from Congressional Reports and debates, as well as from the Department of the Interior and its subdivisions responsible for managing federal lands. They first contend that the 1914 Act's relationship to the Pickett Act of 1910 reflects Congressional intent to restrict the reservation of gas to hydrocarbon gas. As discussed above, the Pickett Act provided a procedure by which the Department of the Interior could withdraw lands from homestead entry. The 1914 Act provided for homestead entry onto these withdrawn lands, subject to a reservation to the United States in the enumerated resources "on account of which the lands were withdrawn or classified or reported as valuable." 30 U.S.C. § 121. The quoted language, maintain plaintiffs, reflects an intent to *limit* the scope of the enumerated substances to those deposits "on account of which the lands were withdrawn." *Id.* Because the lands in question purportedly were withdrawn "on account of" petroleum,[10] carbon dioxide gas deposits are excluded from the "oil and gas" reservations in plaintiffs' patents.

Plaintiffs' argument is unconvincing. First, plaintiffs point to no administrative fact-findings that *their lands* actually *were* the subject of petroleum withdrawals.[11] The 1914 Act also applies to lands "classified or reported as valuable" for the six enumerated resources. *Id.* The IBLA noted that "[t]here is no evidence that the land involved herein was withdrawn, classified, or reported as valuable on account of carbon dioxide. However, the mineral reservations clearly embrace the term 'gas.' We must, therefore, presume that the land was either withdrawn, classified, or report-

---

*Brennan* and *Northern Natural Gas* also preclude plaintiffs' argument that no drafter of a statute would list five "specific" minerals and put the more generic term "gas" somewhere in between them. In our opinion in *Brennan,* we held that "oil" in the 1914 Act was to be *broadly* defined to include kerogen, a substance containing no oil. In *Northern Natural Gas,* we held that the words "oil" and "gas" have equal status. *See* 441 F.2d at 711. Other minerals enumerated in the Act are thus clearly not as "specific" as plaintiffs would have us believe.

**10.** So-called "petroleum withdrawals" were common under the Pickett Act and were also part of the practice of the Interior Department prior to the passage of the Pickett Act. *See* supra at 585–86.

**11.** In their Reply Brief at 6 n. 2, plaintiffs assert that "oil permits" were what led to the reservation of "oil and gas" in plaintiffs' patents under the 1914 Act. The oil permits to which plaintiffs refer appear in the various patentees' waivers and consents to the 1914 Act's reservations in oil and gas in their patents. *See, e.g.,* rec., vol. II, at 181. These permits were considered permits for "oil and gas" by the Department of the Interior. *See id.* at 182. Although not entirely clear, these prospecting permits appear to refer to the Mineral Lands Leasing Act of 1920's provisions allowing private persons to prospect for minerals owned by the United States. *See id.* at 189 (referring to "permit to prospect for oil and gas under the Act of February 25, 1920 (41 Stat. 437)"). As we discuss infra at 25–26, the Mineral Lands Leasing Act defined gas broadly to include both hydrocarbon and non-hydrocarbon gases. Therefore, we do not believe these permits force a limiting construction on the reservations in the 1914 Act to hydrocarbon gas only. To the contrary, they tend to favor a construction of "gas" in pari materia with the Mineral Lands Leasing Act.

ed as valuable on account of 'gas.' " *Lanier*, 93 Interior Dec. at 70 n. 6.

In addition, while there is no evidence that their lands were withdrawn *specifically* "on account of" carbon dioxide gas, evidence that the "gas" on account of which the lands were withdrawn, classified, or reported as valuable *excluded* carbon dioxide is also absent. It is true that such withdrawals were termed "petroleum" withdrawals in the Department's yearly reports to Congress, *see, e.g.,* Letters from the Secretary of the Interior to Congress dated Dec. 13, 1912 and Dec. 16, 1913, *supra,* but plaintiffs concede that the withdrawals encompassed oil *and* "gas." *See* Opening Brief at 19. Congress in the Pickett Act of 1910 excepted "gas" in withdrawn lands from "exploration, discovery, occupation and purchase" under federal mining laws. 36 Stat. 847. Plaintiffs provide us no reason for construing the term narrowly in the Pickett Act of 1910. Indeed, two years before the 1914 Act was passed, the Pickett Act was amended to exempt nonmetalliferous minerals, indubitably encompassing carbon dioxide gas. *See* 37 Stat. 497. We do not agree with plaintiffs that the Pickett Act somehow forces a limiting construction on the word "gas" in the 1914 Act. It is entirely plausible that Congress contemplated the raw natural gas stream from a gas well in both acts.

Plaintiffs next contend that Congress knowingly adopted the definition of gas

then used by the sub-agencies of the Department of the Interior charged with the administration of federal lands. A 1913 treatise concerning the classification of federal lands published by the United States Geological Survey, for example, described the immediate purpose of classifying oil and gas land "to withhold from entry all lands containing valuable deposits of fluid hydrocarbons pending the enactment of adequate legislation providing for their disposition." Bulletin 537 at 117. Assuming that Congress adopted and approved this language, it reveals no clear intent to reserve *only* hydrocarbon gas.[12] Indeed, that same document reflects awareness that "oil and gas" may encompass more than hydrocarbons. For instance, the Bulletin defined oil and gas as being composed *"for the most part* of carbon and hydrogen." *Id.* at 112 (emphasis added). Although these other substances composing oil and gas remain unnamed, Congress was probably aware that while "gas" usually meant fuel gas, it also could mean noncombustible, naturally-occurring underground gases such as the carbon dioxide at issue here. *See e.g., Mineral Resources of the United States,* 323–333 USGS Bull., Dep't of the Interior (1911) (showing gaseous components of natural gas fields in California, including carbon dioxide).

The Department of the Interior refers several times in connection with the entry acts to the reservation of "fuel minerals" and "fuel gases." For example, Franklin

---

**12.** In support of its argument that Congress adopted this definition, plaintiffs cite to one comment by Representative Mondell, the 1914 Act's sponsor, in House debate on the 1914 Act. Representative Mondell stated:

"[I]f land is withdrawn for oil, coal and gas, *the two being always coupled,* the reservation would be at the oil and the gas and the coal." 51 Cong.Rec. 10,493 (1914); rec., vol. II, at 22 (emphasis added).

In our view this statement again supports the proposition that fuel gas was the primary, if not the only, concern of Representative Mondell. It does not mean that he approved of the USGS publications on the subject. It also does not mean that he, or Congress for that matter, intended to convey all other types of gas to the patentee.

Were this statement given the literal import that plaintiffs suggest, certain types of fuel gas

such as "dry gas" would pass to the patentee because it is not "coupled" with oil. *See* 8 H. Williams and C. Meyers, *Oil & Gas Law, Manual of Terms,* 283 (1987) (dry gas is gas produced from a stratum that does not contain crude oil). On the other hand, it was well known at the time that nonhydrocarbon gases often are "coupled" with oil. *See Mineral Resources of the United States,* 323–333 USGS Bull., Dep't. of the Interior (1911) (indicating composites of natural gas in California fields as including significant nonhydrocarbon constituents); *Helium–Bearing Natural Gas* 86 USGS Bull. 36 (nonhydrocarbon gases occur in most natural gas and are important constituents in some varieties). Perhaps because of these uncertainties Congress saw fit to reserve "gas" regardless of its chemical composition. Plaintiffs point to no legislative history dictating otherwise.

K. Lane, then the Secretary of the Department of the Interior, characterized coal, phosphate, oil, gas, potassium, and sodium as fuel and fertilizer minerals. *See* rec., vol. II, at 99 (Letter from Franklin K. Lane, Secretary of the Department of the Interior to Rep. Scott Ferris, Chairman of the House Committee on Public Lands (May 1, 1914) (concerning H.R. 16136, reserving minerals to United States)); *see also id.* at 116 (Letter from Franklin K. Lane, Secretary of the Interior to Sen. Henry L. Myers, Chairman of the Committee on Public Lands (Jan. 10, 1916) (concerning S. 777, referring to enumerated substances as fuel and fertilizer minerals)); *id.* at 141 (Letter from First Assistant Secretary of the interior A.A. Jones to Sen. Henry L. Myers, Chairman of the Committee on Public Lands (Sept. 16, 1914) (concerning S. 6484 extending reservations to Alaska and referring to definite policy of separate dispositions of "surface estates and mineral deposits in certain classes of important fuel and fertilizer minerals")).

Plaintiffs ask us to infer from these executively generated materials that Congress clearly adopted a narrow interpretation of gas. We note first that plaintiffs' citations from historical sources are selective. Other items of correspondence concerning the same subject matter simply enumerate the listed substances. *See, e.g.,* Letter from A.A. Jones, Assistant Secretary of the Interior to Rep. Scott Ferris, Chairman of the House Committee on Public Lands (Jan. 16, 1914); Letter from Franklin K. Lane to Rep. Scott Ferris, Chairman of the House Committee on Public Lands (Mar. 12, 1914). More significantly, the 1914 Act itself incorporated none of the language employed in the letters and documents to which plaintiffs cite. In fact, there is some evidence that some members of Congress rejected the Department's proposed characterization. In testimony concerning a 1914 bill to lease mineral deposits owned by the United States, the following colloquy between the Chairman of the House Public Lands Committee and the Director of the USGS took place:

"Rep. Ferris: This bill purports to deal with six classes of deposits in the United States.

Mr. Smith: You might make that simpler by saying there are two general classes of deposits, mineral fuels and mineral fertilizers.

Rep. Ferris: I was following the wording of the bill."

Hearing before the House Committee on the Public Lands, House of Representatives, 63d Cong., 2d Sess., on H.R. 14094 (1914) at 16.

Most importantly, six years later in the Mineral Lands Leasing Act of 1920, Congress again employed the word "gas" in an enumeration comparable to the 1914 Act, granting authority to the Department of the Interior to lease "coal, phosphate, sodium, oil, oil shale, or gas" owned by the United States. 41 Stat. 437. The 1920 Act also provided that

"the United States reserves the right to extract helium from all *gas* produced from lands permitted, leased or otherwise granted under the provisions of this Act.... *Provided further,* That in the *extraction of helium from gas produced from such lands,* it shall be so extracted as to cause no substantial delay in the delivery of gas produced from the well to the purchaser thereof...."

41 Stat. 438 (emphasis added). The emphasized language has meaning only if Congress understood "gas" to mean the raw gas stream from a well, including both combustible and noncombustible components. Aside from the snippets of legislative history such as those discussed above, plaintiffs offer no reason why the word "gas" in these two substantially contemporaneous and interrelated statutes should not be construed in pari materia. At the very least, the 1920 Mineral Lands Leasing Act demonstrates that when Congress intended to legislate concerning naturally occurring underground gases in a generic sense, it chose the word "gas" with full knowledge that the word would be con-

strued to mean combustible *and* noncombustible gases.[13]

Our review of legislative and historical materials surrounding the enactment of the 1914 Act fails to clear up the ambiguity in the word "gas" as employed in the 1914 Act. Plaintiffs point to nothing in these extrinsic sources even intimating that Congress has "directly addressed the precise question at issue," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, in favor of their proposed limiting construction. If anything, a comparison of the term "gas" as used in related statutes favors a generic construction of the term, although we believe it equally likely that Congress had no intent whatsoever concerning carbon dioxide gas.

### IV.

Having concluded that Congress was silent on the question whether carbon dioxide is "gas" within the meaning of the 1914 Act, we next address plaintiffs' argument that we must not defer to the Department of the Interior's construction of the Act. Deference is not warranted, they argue, because there is no "longstanding and consistent agency policy of defining carbon dioxide to be a 'gas.'" Opening Brief at 35.

Until the inception of this dispute, the Department of the Interior had no occasion to determine explicitly whether carbon dioxide is "gas" within the meaning of the 1914 Act. Plaintiffs maintain that the determinative administrative interpretations of a statute vesting property rights are those contemporaneous with the passage of the Act, and that those interpretations make clear the Department's original understanding that only fuel gas was reserved. They argue that the Department's current construction of the word "gas" to include carbon dioxide conflicts with its earlier definitions, robbing the current construction of its entitlement to judicial deference. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (agency interpretation conflicting with earlier interpretation entitled to considerably less deference than a consistently held view); *Shoshone Indian Tribe v. Hodel*, 903 F.2d 784, 787 (10th Cir.1990) (same).

To support their argument, plaintiffs refer us to Bulletin 537, concerning the classification of the lands of the United States. We have already discussed Bulletin 537, *see supra* at 592, and we think that it constitutes overwhelming evidence that gas in the Department's view meant "for the most part"[14] fuel gas, but not *only* fuel gas. Plaintiffs provide no conclusive or even persuasive support for their suggested negative inference that only fuel gas constituted gas in the early Department interpretations. It is equally plausible that the Department had in mind the raw natural gas stream from a gas well, the only significantly valuable component of which was fuel gas.

This economic fact could well explain why in many Departmental publications the

---

**13.** It is conceivable that Congress intended "gas" to mean hydrocarbon gas only in the 1914 Act, and then used the same word in the 1920 Mineral Lands Leasing Act generically to mean naturally-occurring underground gases. However, two years after the enactment of the 1920 Mineral Lands Leasing Act, Congress reserved "coal, oil or gas" in Alaska patents without qualifying or amending the reach of the term "gas." *See* Act of March 8, 1922, ch. 96, 42 Stat. 415 (codified as amended at 43 U.S.C. §§ 270–11 to 270–12), *repealed in part by* FLPMA § 703(a), 90 Stat. 2790 (1976). Given the explicit concern over helium in the Mineral Lands Leasing Act and the implicit assumption that "gas" included helium, it seems far-fetched indeed to conclude that Congress would have reserved fuel gas only in the 1922 Act. It also seems unlikely that Congress would consciously use "gas" to mean fuel gas in 1914, then use "gas" to mean naturally-occurring underground gases in 1920, and then revert to the narrow meaning in the Alaska gas reservations. That Congress would reserve fuel gas only in the contiguous United States and then reserve gas in the generic sense in Alaska without making itself more explicit seems equally irrational. The most rational reading is that Congress intended "gas" to mean the same thing in all three statutes.

**14.** Other USGS Publications make it clear that the Agency considered carbon dioxide to be a *component* of natural gas. *See, e.g., Mineral Resources of the United States*, 323–333 USGS Bull., Dep't of the Interior (1911) (table entitled "The Composition of Natural Gas" includes hydrocarbons, carbon dioxide, and other gases).

term gas was used mainly in the context of gas in association with oil. *See Petroleum Withdrawals and Restorations Affecting the Public Domain*, 623 USGS Bull. 59, Dep't of the Interior (1916) ("close analogy between the oil and natural gas industries, *at least as far as the production is concerned*") (emphasis added) (citation omitted); *Bibliography of North American Geology for 1914*, 617 USGS Bull. 295, Dep't of the Interior (1915) (noncombustible gases occurring in oil fields generally not subject of analysis); *Useful Minerals of the United States*, 585 USGS Bull. 237, Dep't of the Interior (1914) (natural gas is mixture of gaseous hydrocarbons). These documents conflict with the Department's current interpretation concerning carbon dioxide only if we stretch their meaning to support the negative inference suggested by plaintiffs. Indeed, 617 USGS Bulletin, published in 1915, characterized ninety-one percent pure carbon dioxide gas as "natural gas." *See* 617 USGS Bull. at 203 (table entitled Analyses of Natural Gas From Farnham Dome Utah). We conclude that the Department's interpretation of the 1914 Act to include carbon dioxide gas in the Act's reservation of "gas" does not conflict with its interpretation of the word gas at the time of the Act's passage.

Plaintiffs, the government, and intervenors all cite to numerous agency definitions of "gas" issued over the years for various purposes and in various contexts. Plaintiffs argue that these definitions reflect the contradictory and inconsistent agency position on the definition of gas over time. The government and intervenors maintain that they represent the Department's long-standing and consistently held view that "gas" includes carbon dioxide gas.[15] Several generalizations can be made about them. First, none of these definitions interpret the 1914 Act. Second, the definitions clearly encompassing noncombustible gases all interpret the Mineral Lands Leasing Act which regulates the conveyance of gas deposits to which the United States holds title. Third, the narrower definitions plaintiffs cite concern specialized issues of regulatory jurisdiction, involve unrelated statutes, or are the products of internal memoranda or particularized factual circumstances. *See United Transp. Union v. Dole*, 797 F.2d 823, 831 (10th Cir.1986) (Logan, J. concurring) ("judicial deference generally is reserved for agency views that have been reflected in *formal* pronouncements or have been known through other means for a long time" (emphasis added)).[16]

15. The Department of the Interior, for purposes of the Mineral Lands Leasing Act has defined "gas" broadly. *See, e.g.,* 55 Interior Dec. 502, 511, 521 (1936) (providing for royalty "on gas *including* inflammable gas, helium, *carbon dioxide* and all other natural gases and mixtures thereof" under Mineral Lands Leasing Act) (emphasis added); 30 C.F.R. § 221.2(*o*) (1942), currently codified at 43 C.F.R. § 3000.0–5(a) (1989) ("gas" under Mineral Lands Leasing Act is "any fluid, either combusible or noncombustible, which is produced in a natural state from the earth and which maintains a gaseous or rarefied state at ordinary temperatures and pressure conditions"); 30 C.F.R. § 206.151 (1989) (" '[g]as' means any fluid, either combustible or noncombustible, hydrocarbon or nonhydrocarbon, which is extracted from a reservoir and which has neither independent shape nor volume" for purposes of Bureau of Land Management's leasing of gas on Indian Lands).

In other statutory contexts, the definition of gas is arguably narrower. *See* 30 C.F.R. § 259.002 (1989) (" 'Gas means natural gas as defined by the Federal Energy Regulatory Commission,' " for purposes of administering the Outer Continental Shelf Lands Act). The Feder-

al Energy Regulatory Commission ruled in 1979 that the carbon dioxide at issue here was not "natural gas" for purposes of jurisdiction under the Natural Gas Act. *See Cortez Pipeline Co.* 7 F.E.R.C. (CCH) ¶ 61,024 (1979); *see also* rec., vol. II, at 160 (memorandum from Solicitor of the Department of the Interior to the Secretary of the Department of Interior (dated April 9, 1931) noting that issuance of prospecting permits for carbon dioxide gas under Mineral Lands Leasing Act could not violate oil and gas conservation policy of 1929).

16. The rationale for disregarding internal memoranda in determining agency positions for purposes of deference is bound up with the reason for considering the consistency of agency views in the first place. In *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), Chief Justice Warren wrote that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Part of the reason there for deferring to the Department of the Interior's construction of an Executive Order was that the interpretation had long been a

■ The law is clear that "great deference" is accorded "consistent and long-standing agency interpretations." *Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1350 (10th Cir.1987). This deference generally applies, however, to agency interpretations of the statute in question, where the interpreting agency is empowered to administer the statute. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In exceptional circumstances, such as where two different statutes were enacted substantially contemporaneously as part of a larger policy or program, or where one statute expressly or implicitly incorporates the language and policy of the other, we believe the agency's interpretation of the related statute should carry some weight so long as the same agency is empowered to administer both statutes. We have previously discussed the relationship of the Mineral Lands Leasing Act and the series of acts, including the 1914 Act, reserving minerals subject to disposition under the 1920 Leasing Act. *See* supra at 587, 593–594. Based on this relationship, we think that the Department of the Interior's interpretations of the word "gas" in section 181 of the Mineral Lands Leasing Act are entitled to some consideration in reviewing the same agency's interpretation of the word in the 1914 Act.

The definitions cited by plaintiffs interpret such temporally and factually distinct statutes as the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1982); *see* 30 C.F.R. § 259.002 (1989); 30 C.F.R. § 256.40(h) (1989), or involve separate statutory schemes administered by different agencies such as the scope of the Federal Energy Regulatory Commission's jurisdiction under the Natural Gas Act. *See Cortez Pipeline Co.*, 7 F.E.R.C. (CCH) ¶ 61,024 (1979). These wholly distinct interpretations of the word "gas" by agencies other than the Department of the Interior in these other contexts have no bearing on the Department's interpretation of the 1914 Act or of the related Mineral Lands Leasing Act, and do not make the Department's practice internally inconsistent.[17] We are also not persuaded that the Interior Department memoranda cited by plaintiffs suffice to alter substantially the Department's longstanding *publicly-held* view as reflected in the regulations governing the leasing of oil and gas deposits. We conclude that the interpretation at issue is consistent with the Department's interpretation of the word "gas" in related legislation. Some deference to the Department's interpretation under *Chevron* is therefore appropriate.

## V.

We now must consider whether the Department of the Interior's construction of the 1914 Act is a permissible one. *Sullivan*, 110 S.Ct. at 964. To affirm the Department's decision, we "need not conclude that the agency construction was the only

---

matter of "public record and discussion." *Id.* at 17, 85 S.Ct. at 802. The Court quoted an earlier case for its rationale:

" '[G]overnment is a practical affair intended for practical men. Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department—on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation.' "

*Id.* (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915)).

**17.** Plaintiffs also rely on 43 C.F.R. § 2880.0–5(g) (1988), which defines "[o]il or gas" as "oil, *natural gas*, synthetic liquid or gaseous fuels, or any refined product produced therefrom." This regulation parrots the language in the Mineral Lands Leasing Act's provisions governing rights-of-way for pipelines through federal lands. *See* 30 U.S.C. § 185 (1988). It is by no means clear that this definition excludes carbon dioxide gas. Indeed, in *Exxon Corp.*, 94 Interior Dec. 139 (1987), the IBLA determined that the term natural gas includes naturally produced carbon dioxide gas within the meaning of 30 U.S.C. § 185 and 43 C.F.R. § 2880.0–5(g). This language, in any event, in no way renders internally inconsistent the Department of the Interior's forty-five year old interpretation of "gas" *deposits* within the meaning of section 181 of the Mineral Lands Leasing Act.

one it permissibly could have adopted," nor must it accord with "the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Rather, we must determine whether it is " 'rational and consistent with the statute,' " *Sullivan*, 110 S.Ct. at 964 (quoting *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987)), taking into account the fact that a consistent and longstanding administrative interpretation of "gas" *in the 1914 Act* is lacking.

The Department's inclusion of carbon dioxide gas within the 1914 Act's reservations certainly does not offend the statute's plain language, which simply refers to "gas."[18] Plaintiffs attempt to give this word a limiting construction through the use of legislative and other historical materials. Our own search through these materials revealed no clear congressional intent to exempt carbon dioxide or any other naturally occurring underground gas from the statutory authorization to reserve "gas." Accordingly, we will defer to the IBLA's interpretation unless it is inconsistent with the purpose and policy of the 1914 Act.

According to plaintiffs, "[t]he purpose of the 1914 Act was to convey all minerals except these carefully enumerated fuel and fertilizer minerals on account of which the land had been specifically withdrawn." Opening Brief at 27. While this characterization is not wholly inaccurate, it is somewhat incomplete. In enacting the 1914 Act, Congress was attempting to accommodate two concerns: (1) to prevent the mismanagement and waste that would occur if certain valuable resources deemed necessary for the country's economic development fell into the wrong private hands, and (2) to fully realize the nation's agricultural potential through the settlement and development efforts of homestead entrants. *See generally United States v. Union Oil Co.*, 549 F.2d 1271, 1274–76 (9th Cir.) (describing events leading to enactment of 1914 Act and related acts), *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977).

Plaintiffs repeatedly point out that, in marked contrast to the Stock Raising Homestead Act of 1916, 43 U.S.C. §§ 291–302, the 1914 Act reserved only the six enumerated classes of minerals instead of the entire mineral estate. This feature of the 1914 Act presumably resulted from political compromise to overcome the opposition to general reservations by representatives of certain Western states. *See, e.g.*, 51 Cong.Rec. 10493 (1914) (colloquy between Representative Mondell of Wyoming arguing for limited mineral estate and Representative Mann of Illinois suggesting a general mineral reservation). Plaintiffs extrapolate from this feature of the 1914 Act their argument that its reservations should be very narrowly construed to preserve its purpose to convey a limited mineral estate to the homestead entrant or purchaser of the surface estate.

The short answer to plaintiffs' argument is that a substantial mineral estate passes to the surface holder regardless of how the express reservation of "gas" in the Act is construed. All metalliferous minerals, as well as those nonmetalliferous minerals not enumerated or reserved, pass to the landowner.[19] Moreover, Congress failed to

---

**18.** Nonfuel gases have been determined to be "gas" within the meaning of various other statutes in the face of arguments that the term "gas" referred only to fuel gas. *See, e.g., Reich v. Commissioner*, 454 F.2d 1157, 1158 (9th Cir. 1972) (geothermal steam is a "gas" within meaning of Internal Revenue Code provision providing depletion allowance for oil and gas wells); *Amoco Prod. Co. v. Wyoming*, 751 P.2d 379, 383 (Wyo.1988) (term "natural gas" in state excise tax statute includes "all gases that occur naturally in gas produced from drilled wells").

**19.** Plaintiffs hotly dispute intervenors' argument that carbon dioxide gas should be reserved because no specific intent exists to exclude it. This conceptual approach is flawed, plaintiffs contend, because requiring specific intent to exclude would effectively reserve all minerals the exclusion of which is not made clear in the language or the legislative history of the 1914 Act. We disagree. Specific intent to exclude such metalliferous metals as gold, silver and copper, etc. exists because they are *not enumerated in the act*. "Gas," in contrast, *is* enumerated. Intervenors refer, quite obviously, to the absence of specific intent to place a limiting construction on the word gas.

modify the term "gas" in the 1914 Act. Finally, plaintiffs fail to give proper weight to Congress' general purpose to ensure proper management and disposition of the reserved minerals, including gas, by retaining them in the public domain.

Part of this general purpose was to lay the groundwork for the rational disposition of these resources. Accordingly, the 1914 Act provided for "the right to prospect for, mine, and remove the same, such deposits *to be subject to disposal by* the United States only as shall be hereafter expressly directed by law.... Any person qualified to acquire the reserved deposits may enter upon said lands with a view of prospecting for the same." 30 U.S.C. § 122 (emphasis added). When construing the 1914 Act, the law relating to the conveyancing, prospecting for, and exploitation of the reserved substances should be given due regard. In this respect, at least, analyses relating to similar problems in construing private mineral conveyances are instructive.

In *Northern Natural Gas Co.*, 441 F.2d 704, we considered a question in the context of an "oil and gas" lease closely analogous to the problem we now confront. The landowner lessors there contended that helium, a noncombustible gas, did not pass to the lessee. *Id.* at 710. In rejecting the lessors' contention that only combustible gas was meant by the term "gas," we looked first to determine if the parties had a "specific intent" concerning the disposition of helium gas. We concluded that the parties "could not have had any intent with regard to it," *id.* at 714, because when the leases were entered into, helium was considered an impurity in the natural gas stream. We then tried to determine the parties' general intent. We observed that:

> "General intent should be discovered not by defining and redefining the terms used but by considering the purposes of the grant in terms of enjoyment of the rights created.
>
> " . . . .

"In our opinion general intent is closer to original intent than is specific intent which blossoms when a component previously regarded as an impurity becomes valuable. The discovery of the use and value of a component does not expand *the grant but the expansion of that dis*covery into tangible value makes more certain the specific object of the general grant. We conclude that, absent specific reservations, the grant of gas by the leases covered all components of the gas, including helium."

*Id.* at 714–15.

The analysis of the leases in *Northern Natural Gas*, maintain plaintiffs, has no application to the construction of a statute such as the 1914 Act. We disagree. The 1914 Act envisioned that the reserved estates eventually could be the subject of conveyances such as leases. Moreover, the leases in *Northern Natural Gas* and the reservations in the 1914 Act each create split mineral estates with unique problems common to both. Finally, at its simplest level the 1914 Act operates to regulate executive conveyances of real property owned by the United States. At bottom, both *Northern Natural Gas* and the dispute here concern what was contemplated in a conveyance of "gas." [20]

We think it fair to say that Congress' general intent in creating the reservation was to put the United States government in a position to convey the same rights a lessor of "oil and gas" could convey to a lessee to enable the latter to "prospect for, mine, and remove the same." 30 U.S.C. § 122. Courts consistently have held that a gas lessee, absent an explicit reservation, is entitled to the raw natural gas stream, whatever its chemical makeup. *See Northern Natural Gas*, 441 F.2d at 715; *Navajo Tribe of Indians v. United States*, 364 F.2d 320, 326, 176 Ct.Cl. 502 (1966).

The analysis in *Northern Natural Gas* and *Navajo Tribe* is nonetheless inapposite, argue plaintiffs, because here the carbon

---

**20.** If anything, plaintiffs' distinction between the private conveyances in *Northern Natural Gas* and the federal patent conveyances regulated by the 1914 Act does not favor their position.

Land grants are usually construed favorably to the United States. *See Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59–60, 103 S.Ct. 2218, 2231–32, 76 L.Ed.2d 400 (1983).

dioxide gas is over ninety-nine percent pure, while in *Northern Natural Gas* and *Navajo Tribe* the noncombustible elements were commingled with the combustible elements. We do not think a rule making property rights to different chemical components of natural gas dependent on the level of purity (or impurity) of the gas would aid in the rational development of the law of mineral resource rights. Moreover, as the court in *Navajo Tribe* wrote:

> "Although the parties to the lease may have been thinking mainly of fuel-type gases, it is still more realistic to presume that the grant included not only hydrocarbons but the other gaseous elements as well. It follows that, whether its percentage was high or low, the helium component was part of the 'gas deposit' which passed to the lessee."

*Navajo Tribe*, 364 F.2d at 326. This reasoning applies equally well to our view of Congress' intent when it reserved "gas" in the 1914 Act.

Other factors influence our conclusion that the Department of the Interior's construction of the 1914 Act is consistent with its purpose. The value of the carbon dioxide gas derives for all practical purposes from its function as a pressurizer and solvent upon being re-injected into "depleted" oil wells. In accord with the 1914 Act's purpose of conserving the nation's fuel resources, reservation of the gas at issue here operates to preserve increasingly scarce domestic sources of fuel. Indeed, a contrary construction would undermine the fuel conservation purpose of the 1914 Act.

Hydrocarbon gas and the carbon dioxide gas here in question also serve parallel functions to some extent, a fact well known during the era of the 1914 Act's enactment. *See* J. Lewis, *Methods for Increasing the Recovery from Oil Sands*, 148 Bureau of Mines Bull. 90, Dep't of the Interior (1917) (concerning reinjection of hydrocarbon gas and other gases into wells as a method to increase oil recovery). Indeed, "[t]he principle of increasing production [of oil] by forcing air *or any other gas* through the oil sand, and many other details of operation, [were] covered [as of 1917] by U.S. patents." *Id.* at 36 n. a (emphasis added). In *Utilities Prod. Corp. v. Carter Oil Co.*, 72 F.2d 655 (10th Cir.1934), we held that an oil lessee had the right to use so-called "dry" hydrocarbon gas to increase oil production. We wrote:

> "The use of gas for repressurizing was *so widely known* in the industry by 1917 ... that the Interior Department had prepared and issued a bulletin of 120 pages on the subject. Repressurizing was in *common use* in the Appalachian fields in *1916*."

*Id.* at 659 (emphasis added). To the extent that the value of "gas" derives, or derived, from its utility in oil recovery, its combustibility is irrelevant.

We have no way of ascertaining that Congress was aware of the value of gas in oil recovery, or whether it intended to reserve it for this purpose. However, had Congress been aware of the value of carbon dioxide gas in the recovery of oil, it strains credulity to conclude that Congress would have created the separate gas estates plaintiffs suggest. We therefore conclude that the Department of the Interior's construction of the 1914 Act's reservation of "gas" to include carbon dioxide gas is "reasonable in light of the statutory purpose." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 455, 98 S.Ct. 2441, 2448, 57 L.Ed.2d 337 (1978).

## VI.

The district court's order is AFFIRMED.