119 F.3d 816
 137 Oil & Gas Rep. 248, 27 Envtl. L. Rep. 21,370,
97 CJ C.A.R. 1135
 SOUTHERN UTE INDIAN TRIBE, Plaintiff-Appellant,
v.
AMOCO PRODUCTION COMPANY; Shirley K.Adams; Henry Ashworth;
Carla M. Aspaas; Eric K. Aspaas; Helen Ruth Aspaas;
Laurabelle Aspaas; Leta M. Adkins; Rita M.Adkins; Maxwell
C. Anderson; Earl A. Barker; Maurice C. Breen, named as:
Heirs of Maurice C. Breen, deceased; Horace F. Buchanan,
named as: the Heirs of Horace Buchanan, deceased; George
A. Bugg; Carbone Investment Company; Jack Carmack;
Rowland Carmack; Joseph C. Ciancio; William Kemp Clark;
Colorado National Bank, George Veto Trust; Colorado
National Bank of Longmont, conservator Gladys N. Frazzini;
Dorothy A. Corgin; Kelly Cox, named as: the Heirs of Kelly
Cox, deceased; A.B. Crosby; Barbara Crosby; David Crosby;
John Crow, Jr.; Margaret Crow; Manuel Cruz; Louis M.
Cummins; Frederick E. Dickerson; J.M. Eakes; Robert
Mcferran Eakes; Margaret Ellison; Sally M. Etterbeck;
Minnie Flaks; Tillie Flaks; Cassio Fraz-Zini; Adele
Frost; Robert Galbasin; Abels. Gallegos; Montey Garnand;
Ruby Gibbsgoggans; Christine Hamilton; Hardin Simmons
University; H.A. Harmon, named as: the Heirs of H.A.
Harmon, deceased; Hondo Oil & Gas Company, named as: the
shareholders of Hondo Oil & Gas Company (dissolved); Hyde
Oil And Gas Corporation; Charles Kettering; Fidellucero;
Richard C. Malcomb; Suzanneheath Manges; Catherine B.
Mcelvain; Mabel Mcelvain; Thornton H. Mcelvain,Jr.;
Dorothy N. Mckelvey; Edwin L. Mckelvey; R. Franklin
Mckelvey; W.R. Mcmahon; cmurry Oil Company; W. Clay
Meredith Charitable Trust; W.A. Moncrief, named as: the
Heirs of W.A. Moncrief, deceased; Roy E. Montgomery,
personal representative for the Estate of W. Clay Meredith,
deceased; Forrest D. Miller, named as: the Heirs of
Forrest D. Miller, deceased; Helen L. Miller, named as:
the Heirs of Helen L. Miller, deceased; Thomas S.
Morrissey; Thomas J. Morrissey; Emil Mosbacher; Emil
Mosbacher, Iii; John David Mos-Bacher; R. Bruce Mosbacher;
Myra Theresa Moulds; North Central Oil Corporation; H.L.
Oliver; Clara Onofrio; Margaret C. Pargin; Harold F.
Payne, Jr.; Neville G. Penrose; Ben M. Peterson, Jr.;
Frederick Petrocco; Phillips Petroleum Company; James M.
Raymond; W.E. Rennie, named as: the Heirs of W.E. Rennie,
deceased; Thomas C. Romolo; Benton E. Smullyen; Clinton
I. Smullyen; William Stirling; J.L. Tatum, named as: the
Heirs of J.L. Tatum, deceased; Anna Carleo Tomeo; Ernest
Tomeo; Turner Securities; Richard W. Turner, Sr.; George
C. Vance, named as: the Heirs of George C. Vance, deceased;
Anthony H. Veto; Joseph F. Ware, Jr.; Albert E.
Zar-Lengo; Anthony F. Zarlengo, John Doe and all other
unknown persons claiming an interest in the mineral estate
located within the N/2 of section 12, T33N, R8W, N.M.P.M.,
La Plata County, Colorado; Amax Oil & Gas, Inc.;
Bowen/Edwards Associates, Inc.; Fuel Resources Development
Company; Mckenzie Methane Corporation; Meridian Oil, Inc.;
Mobil Oil Corporation; National Cooperative Refinery
Association; Northwest Pipeline Corporation; Pablo
Operating Company; Palo/Eagle Joint Ventures; Richmond
Petroleum, Inc.; Williams Production Company; Union Texas
Petroleum Corporation, John Doe oil company and all other
unknown persons or entities claiming leasehold working
interests or operating rights to explore for, produce or
develop coalbed methane or coal constituents from coal or
coal strata reserved by the United States in patents issued
under The Act of June 22, 1910, for lands located within the
exterior boundaries of the Southern Ute Indian Reservation,
and which entities have not obtained tribal consent to and
federal approval of said exploration, production or
development activities; Manuel Lujan, Jr., Secretary of the
United States Department of the Interior; Department Of
Interior, and its subordinate agencies; Bureau of Indian
Affairs; Bureau of Land Management; Minerals Management
Service; Eddie F. Brown, Assistant Secretary of the Bureau
of Indian Affairs; Catherine Frances Mcelvain Harvey;
Delos Cy Jamison, Director of the Bureau of Land Management;
and Scott S. Sewell, Director of the Minerals Management
Service; Class of Defendants situated similarly to those
named non-governmental defendants who claim ownership of an
interest in coalbed methane and other coal constitutents or
claim the right to explore for, develop or produce those
substances from coal or coal strata reserved by the United
States in patents issued under the Act of March 3, 1909, or
the Act of June 22, 1910, for lands located within the
exterior boundaries of the Southern Ute Indian Reservation
and which class members have not obtained tribal consent to
and federal approval of said interests of rights; Jack
Balle; J.M. Huber Corporation, Oil & Gas Division; Mary
Jean Balle; Donald C. Ciancio; Susie M. Ciancio; Ncnb
Texas National Bank, as trustee of the Kelly Cox
Testamentary Trust; Addie G. Crosby; Jack W. Crosland,
Jr.; Henry L. Enochson; Mary Jane Enochson; J.L. Goggans;
Liberty Tulsa, as trustee of the Christine J. Hamilton
Trust; Helen Crosland Hendricks; Thomas L. Johnstone;
James Eric Kaindl; Larry James Kaindl; Lisa Jean Kaindl;
Jane P. Mosbacher, named as The Heirs of Jane P. Mosbacher,
Deceased; PM Associates, a Colorado general partnership;
First Interstate Bank of Denver, as Co-trustee of the Estate
of W.E. Rennie est W.E. Rennie; Roderick L. Turner; Wells
Fargo Bank, as trustee of the George C. Vance Trust; Albert
E. Zarlengo, Jr., as trustee for the Albert E. Zarlengo
Trust; Bell South Corporation Health Care Trust; J.
Magness, Inc.; SG Interests I, Ltd; Mosbacher U.S.A.,
Inc.; Land Owners Coalseam Committee, Defendants-Appellees,
Tiffany Gas Company, Defendant.
 No. 94-1579.
 United States Court of Appeals,
Tenth Circuit.
 July 16, 1997.
 
 Thomas H. Shipps, of Maynes, Bradford, Shipps & Sheftel, Durango, CO (Scott B. McElroy and Alice E. Walker, of Greene, Meyer & McElroy, P.C., Boulder, CO, and Michael T. McConnell, of Long & Jaudon, Denver, CO, with him on the briefs), for Plaintiff-Appellant.
 Jacques B. Gelin, Department of Justice, Washington, DC (Lois J. Schiffer, Assistant Attorney General, Washington, DC, Henry J. Solano, United States Attorney, Denver, CO, William G. Pharo, Assistant United States Attorney, Denver, CO, John A. Bryson and Thornton Withers Field, Attorneys, Department of Justice, Washington, DC, and John R. Kunz, Of Counsel, Department of the Interior, Denver, CO, with him on the brief), for Defendants-Appellees.
 Charles L. Kaiser, of Davis, Graham & Stubbs, L.L.C., Denver, CO (Anthony J. Shaheen and Thomas S. Nichols, of Davis, Graham & Stubbs, L.L.C., Denver, CO, and David E. Brody, Amoco Production Company, Denver, CO, with him on the brief), for Amoco Production Company, Defendant-Appellee.
 Before SEYMOUR, Chief Judge, COFFIN* and McKAY, Senior Circuit Judges.
 SEYMOUR, Chief Judge.
 
 
 1
 The Southern Ute Indian Tribe (the Tribe) appeals the district court's grant of summary judgment to defendants Amoco Production Company and others on the Tribe's claim to ownership of coal bed methane (CBM) contained in coal acquired by the Tribe as successor in interest to a statutory reservation of coal to the United States. The Tribe also appeals the district court's grant of summary judgment to the Secretary of the Interior, the Department of the Interior, and the Department of the Interior's subordinate agencies (the federal defendants) on the Tribe's claim of breach of fiduciary duty. We reverse the district court on the issue of CBM ownership and remand for further proceedings consistent with this decision.[1]
 
 I.
 
 2
 In 1991, the Tribe brought suit against Amoco Production Company, other oil companies, and individual oil and gas lessees and lessors (the Amoco defendants) who asserted ownership interests in CBM contained in coal owned by the Tribe. In its First Amended Complaint, the Tribe claimed ownership of CBM and asserted that various Amoco defendants, by exploring for and extracting CBM under oil and gas leases, had among other things: 1) trespassed on Tribal lands; 2) trespassed on Tribal coal; 3) converted Tribal coal; 4) failed to pay severance tax to the Tribe; and 5) in collusion with State of Colorado officials, deprived the Tribe of federally guaranteed rights in violation of 42 U.S.C. § 1983. The Tribe sought a variety of remedies including: 1) a declaratory judgment vesting in the Tribe ownership of CBM and other substances contained in Tribal coal; 2) a declaratory judgment that Tribal consent is required for CBM extraction; 3) an order quieting title to CBM in the Tribe; 4) injunctive relief to prevent continued exploration and production of CBM without Tribal consent; 5) damages for present and future injuries to coal, for extraction of CBM, for conversion of coal, for civil rights violations, and for failure to pay severance taxes; 6) title to all exploration and production facilities on Tribal lands which, if removed, would interrupt production of CBM; and 7) costs and attorney's fees.
 
 
 3
 The Tribe also sued the federal defendants in their capacities as trustees for the Tribe. The Tribe claimed that the federal defendants breached their fiduciary duties to the Tribe by allowing exploration and extraction of CBM under oil and gas leases. The Tribe sought a declaratory judgment on the breach of fiduciary duty issue, and sought injunctive relief to prevent the federal defendants from issuing permits to explore for and extract CBM under oil and gas leases or from otherwise acquiescing in the derogation of the Tribe's alleged ownership interest in CBM.
 
 
 4
 Two issues were identified as fundamental to the resolution of all claims against the Amoco defendants: 1) the determination of CBM ownership, and 2) the existence of and applicability of defenses based on acts or omissions of the Tribe. Since resolution of either issue in favor of the Amoco defendants would settle all claims, the district court granted a joint motion by the Tribe and Amoco to bifurcate these issues. The parties then moved to certify "a defendant class comprised of all persons, except the Tribe and governmental entities, who claim an ownership interest in the coalbed methane" for the purposes of resolving the bifurcated issues. Aplt.'s App., vol. I at 214. Amoco was designated as representative of the class and, in that capacity, brought a motion for summary judgment on the bifurcated issues. Id., vol. II at 353.
 
 
 5
 The federal defendants supported the Amoco defendants' claim of ownership of CBM and asserted accordingly that they had no fiduciary duty to manage an asset for the Tribe which it did not own. The federal defendants filed a motion for summary judgment based on the Tribe's nonownership of the CBM. In the alternative, they moved to dismiss the Tribe's action as time-barred. Id. at 365. The Tribe brought a cross-motion for summary judgment on the issue of CBM ownership.
 
 
 6
 The district court held that CBM ownership was vested unambiguously in the Amoco defendants. Southern Ute Indian Tribe v. Amoco Prod. Co., 874 F.Supp. 1142, 1160 (D.Colo.1995). Consequently, the court concluded it "need not address further the application of the common defenses to the ownership question," id. at 1160, or reach the federal defendants' claims that the Tribe's action was barred by the statute of limitations, id. at 1161. It then granted summary judgment to the Amoco defendants on the issue of CBM ownership, and to the federal defendants on the "issue of breach of fiduciary duty for failure to manage the CBM gas," leaving for later determination other issues concerning fiduciary duty. Id. The court denied the Tribe's motion for summary judgment. Id. It is from these rulings that the Tribe appeals.[2]
 
 II.
 
 7
 The single issue which is determinative of this appeal is whether the Tribe, as successor in interest to a statutory reservation of coal to the United States made in the coal lands acts of 1909 and 1910, is also the owner of CBM, a gaseous substance contained in coal. "We review a grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c)." Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir.1995). Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is due judgment as a matter of law. Id. We construe the facts and record in the light most favorable to the party opposing the motion. Id. "We also review de novo the district court's interpretation of a federal statute." Id.; see also Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1393 (10th Cir.1990).
 
 
 8
 Determination of CBM ownership where the Tribe has acquired its coal via a statutory reservation to the United States presents a question of statutory interpretation. The purpose of statutory construction is to determine congressional intent. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) ("Our task is to give effect to the will of Congress...."). We must decide whether Congress intended to reserve CBM to the United States (and thus to the Tribe as its successor in interest) as part of the coal reservations in the 1909 and 1910 Acts, or whether Congress intended that CBM be treated as part of the unreserved estate (belonging to the Amoco defendants' predecessors in interest).[3]
 
 
 9
 Of critical importance is the long recognized principle of statutory construction, applicable here, that "ambiguity or uncertainty in the terms employed [in land grants] should be resolved in favor of the government." Burke v. Southern Pac. R.R. Co., 234 U.S. 669, 680, 34 S.Ct. 907, 912, 58 L.Ed. 1527 (1914). It is an " 'established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.' " Watt v. Western Nuclear, Inc., 462 U.S. 36, 59, 103 S.Ct. 2218, 2231, 76 L.Ed.2d 400 (1983) (quoting United States v. Union Pac. R.R. Co., 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957)) (emphasis added) (concluding that gravel is included in mineral reservation to the United States). The burden remains on defendants here to dispel any ambiguity in the construction of the coal reservation.
 
 A. Plain Meaning of the Statutes
 
 10
 "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). "In interpreting statutes, we begin with the relevant language." Aulston v. United States, 915 F.2d 584, 589 (10th Cir.1990). Where the will of Congress "has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.' " Griffin, 458 U.S. at 570, 102 S.Ct. at 3250 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).
 
 
 11
 The relevant part of the 1909 Act states that "[a]ny person ... shall ... upon making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which shall contain a reservation to the United States of all coal in said lands, and the right to prospect for, mine, and remove the same." 30 U.S.C. § 81 (emphasis added) (hereinafter the 1909 Act).[4] The 1910 Act similarly states that a prospective homestead entrant's "patent shall contain a reservation to the United States of all the coal in the lands so patented, together with the right to prospect for, mine, and remove the same." 30 U.S.C. § 85 (hereinafter the 1910 Act).
 
 
 12
 The Acts neither define coal nor mention CBM; thus, the statutes do not by their plain language indicate congressional intent regarding CBM. Even in the absence of a plain articulation, however, we have other means available to evaluate congressional intent. See generally INS v. Cardoza-Fonseca, 480 U.S. 421, 431-48, 107 S.Ct. 1207, 1212-22, 94 L.Ed.2d 434 (1987). Following this circuit's traditional approach as developed in Northern Natural Gas Co. v. Grounds, 441 F.2d 704 (10th Cir.1971), and followed in Aulston, 915 F.2d at 589-599, we use traditional tools of statutory construction to investigate whether inclusion of CBM in the coal reservation was either specifically intended by Congress, or is consistent with Congress' general legislative purpose in enacting the 1909 and 1910 Acts.
 
 B. Specific Congressional Intent
 
 13
 Congress' specific intent to include or exclude CBM in its reservation of coal must be judged from the perspective of Congress at the time of enactment of the 1909 and 1910 Acts. From that perspective, the Amoco defendants argue that we can easily discern Congress' specific intent. First, they argue that in 1909 coal was typically defined as a solid rock, without specific mention of gaseous constituents. Amoco Br. at 17; Amoco Prod. Co., 874 F.Supp. at 1153. Second, they contend that in 1909 Congress was aware of CBM as a hazardous gaseous byproduct of coal and could specifically have retained the CBM by inserting the word "gas" in the mineral reservation had it so wished. From these facts defendants conclude that Congress' use of the word "coal" in its mineral reservation was not inadvertent, and that Congress specifically chose to reserve only solid rock coal.[5]
 
 
 14
 We might agree with Amoco if we were construing a contemporary reservation in the light of the present commercial value of CBM and the relative ease of its extraction. But our task is to try to discern the intent of Congress almost three quarters of a century ago. Even if Congress intended to retain only solid rock coal, in 1909 Congress may have considered CBM to be part of that solid coal. CBM is generated as part of the chemical and physical processes which convert carbon-rich sediments into solid coal (coalification). J. Hovey Kemp & Kurt M. Petersen, Coal-Bed Gas Development in the San Juan Basin: A Primer for the Lawyer and Landman, 1988 ROCKY MTN. ASS'N OF GEOLOGISTS 257, 259. In this respect, CBM is like other hydrocarbon gases which are similarly generated by the compaction and chemical alteration of carbon-rich source rock. But, unlike hydrocarbon gases which are mobile (fugacious) and are typically found trapped in reservoir rocks distant from their source rocks, the CBM at issue in this case is still trapped in the rock with which it was generated. It is trapped by adsorption[6] "on the internal surface of micropores," and as "free gas in cracks and fractures."[7] Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits, 88 Interior Dec. 538, 540 n. 11 (1981) (quoting Deul, Methane Drainage from Coal Beds, A Program of Applied Research, 60 ROCKY MTN. COAL MINING INST. 13 (1964)). CBM which is trapped in coal cannot migrate away from the coal.
 
 
 15
 Furthermore, although CBM in a gaseous state can be produced from coal, prior to that production most CBM is not, in situ, a "gas" within the typical physical definition of the term.[8] It is not sufficiently like other natural gases for us to conclude that Congress unambiguously intended the owners of other natural gases to also own CBM associated with the reserved coal. The adsorbed component of CBM is molecularly bound to the coal and cannot be released without an alteration in the physical state of the coal. In fact, release of either adsorbed or fracture-trapped CBM requires production techniques which often cause significant damage to the coal.[9] CBM ownership, therefore, cannot be disposed of by the simple tautology that gas is gas. We are concerned not with the physical state of the substance as gas at the surface when it is produced, but rather with its physical state prior to extraction, as trapped in coal. Even assuming Congress specifically intended to retain only solid rock coal, that solid rock coal is the source for and traps CBM. Because CBM is an integral part of the coal, Congress could certainly have considered it part of the solid rock.[10] Indeed, it seems to us quite unlikely that Congress, if it had considered the matter, would have reasoned, "We want the Government to hold on to the solid bituminous core of these coal deposits, but we make no claim to the thin layer of molecules of CBM which coats the surfaces."
 
 
 16
 Moreover, we disagree that a specific intent to retain only solid rock coal was evinced by Congress' awareness that CBM was occasionally released as a hazardous byproduct of coal mining. CBM was not readily severable from coal in 1909 even though it is now "potentially severable" through application of advanced drilling and production technologies.[11] See Kemp & Petersen, supra, at 261 ("Due to technical advances and changes in the world energy supply, the recovery and utilization of coal-bed gas now appears to be more feasible."). It is not reasonable to impute to Congress a desire to retain only solid rock coal constituents and to convey gaseous coal constituents when CBM is an integral component of coal and in 1909 there appears to have been no technology by which a patent holder could extract CBM from coal without damaging or destroying the coal. Because no effective means existed in 1909 to remove CBM leaving the coal behind, CBM physically trapped in coal was necessarily retained with the coal reservoir.
 
 
 17
 The fact that CBM could not be commercially extracted from coal in 1909 indicates to us it is inappropriate to conclude that Congress intended a specific result one way or the other regarding CBM by its use of the word "coal." Rather, we conclude that where the commercial value of CBM was unappreciated at the time of the enactment, the text of these acts gives us no particular indication of Congress' specific intent with regard to that asset. See United States v. Union Oil Co. of California, 549 F.2d 1271, 1273 (9th Cir.1977) ("Congress was not aware of geothermal power when it enacted the Stock-Raising Homestead Act in 1916; it had no specific intention either to reserve geothermal resources or to pass title to them."); Northern Natural Gas, 441 F.2d at 714-15 (no specific intent to exclude helium will be inferred where lessors neither knew of presence nor appreciated value of helium gas); cf. Aulston, 915 F.2d at 594, 599 (rejecting argument that use of "gas" in mineral reservation evinced a specific congressional intent to exclude carbon dioxide from a gas reservation, when inclusion comported with general intent of statute and value of carbon dioxide was not appreciated at time of mineral reservation).
 
 
 18
 We are thus unable to conclude that Congress formed a specific intent to convey CBM as a gas given the uncertainty that Congress viewed CBM as a component distinct from solid rock coal, knew CBM was severable, knew that it had a value, and purposefully chose to reject that value. As a consequence, we are persuaded that the 1909 and 1910 Acts are ambiguous with respect to Congress' specific intent regarding CBM. Cf. Western Nuclear, Inc., 462 U.S. at 56, 103 S.Ct. at 2229-30 (noting that the term "mineral" is ambiguous with respect to congressional intent to reserve gravel as a mineral). In the absence of specific congressional intent, we look at the general purpose of the statute and the historical context in which it was enacted to determine congressional intent. Aulston, 915 F.2d at 598. "General intent should be discovered ... by considering the purposes of the grant in terms of enjoyment of the rights created." Northern Natural Gas, 441 F.2d at 714. "In our opinion general intent is closer to original intent than is specific intent which blossoms when a component previously regarded as an impurity becomes valuable." Id. at 715.
 
 C. General Congressional Intent
 
 19
 "In interpreting the relevant [statutory] language ... we look to the provisions of the whole law, and to its object and policy." Aulston, 915 F.2d at 589; see also United States v. Colorado, 990 F.2d 1565, 1575 (10th Cir.1993). "[W]e look at not only the statute itself but also at the larger statutory context. We may ascertain the intent of Congress through statutory language and legislative history." Utah v. Babbitt, 53 F.3d at 1148 (citations omitted).
 
 1. History
 
 20
 To understand the general congressional intent behind the 1909 and 1910 Acts, we review the historical context in which they were enacted, including the history of the Southern Ute Tribe's acquisition of its reservation lands and the United States' reservation of the coal it ultimately conveyed to the Tribe. We begin in the latter half of the nineteenth century with the formation of the Southern Ute Indian Reservation.
 
 
 21
 The Ute Indian Reservation was established in 1864, when the Uncompahgre, White River and Southern Utes "exchanged their aboriginal lands in New Mexico, Utah, and Colorado for ... approximately 15.7 million acres ... within Colorado." United States v. Southern Ute Tribe or Band of Indians, 402 U.S. 159, 162, 91 S.Ct. 1336, 1338, 28 L.Ed.2d 695 (1971). The reservation did not long remain intact. In 1874, 3.7 million acres of the reservation were ceded to the United States upon discovery of mineral resources on reservation land. Id. In 1880, the remaining reservation land was ceded to the United States in return for individual allotments and "shares in the proceeds of unallotted land sales." Id. at 164, 91 S.Ct. at 1339 (quoting United States v. Southern Ute Tribe or Band of Indians, 191 Ct.Cl. 1, 423 F.2d 346, 350 (1970)). The Uncompahgre and White River Utes left the reservation before 1882. Id. at 162, 91 S.Ct. at 1338.
 
 
 22
 After the cession of reservation land, the United States opened the ceded, non-allotted reservation to homesteading and mineral exploration under the terms and conditions of a variety of federal statutes. Amoco Prod. Co., 874 F.Supp. at 1148 (citing the Homestead Act of 1862, 43 U.S.C. §§ 161 et seq. (repealed 1976), the Coal Lands Act of 1873, 17 Stat. 607, and the Mining Law of 1872, 30 U.S.C.A. § 22). At that time, "the disposition of land owned by the United States depended upon whether it was classified as mineral land or nonmineral land, and title to the entire land was disposed of on the basis of th[at] classification." Western Nuclear, Inc., 462 U.S. at 47, 103 S.Ct. at 2225. Because the United States Geological Survey had insufficient resources to evaluate the mineral character of each land parcel before patent issuance, it often depended on the attestation of a patent applicant to determine the character of his land. Id. at 48 n. 9, 103 S.Ct. at 2225 n. 9. Although this honor system for patent evaluation inevitably led to considerable abuse, agricultural settlement and mineral exploration of reservation lands and other areas in the western United States proceeded for several decades under this system.
 
 
 23
 In 1906, President Roosevelt withdrew from homesteading or mineral patenting approximately 64 million acres considered to be valuable for coal resources, including the ceded, non-allotted Ute Reservation lands. Id. at 48-49, 103 S.Ct. at 2225-26 (citing 41 CONG. REC. 2615 (1907)). Two concerns drove the withdrawal of coal lands: first, the government wished to end the issuance of patents in reliance on an entrant's attestation of the mineral character of the land; and second, the government wished to encourage optimal land use by ensuring that lands valuable for mineral resources would not be held unavailable for mineral exploration by homesteading claims. Id. In his Sixth Annual Message to the nation, President Roosevelt explained that the withdrawal was necessary to preserve ownership of coal resources in the United States and to ensure price control of coal and disposition of the coal resources "under conditions which would inure to the benefit of the public as a whole." PRESIDENT THEODORE ROOSEVELT, SIXTH ANNUAL MESSAGE (Dec. 3, 1906), reprinted in XV THE WORKS OF THEODORE ROOSEVELT 363 (1926).
 
 
 24
 The 1906 withdrawal included lands on which the process of homesteading (holding the land for a term of years in agricultural use in return for a land patent) had begun. Homesteaders who had entered the land in good faith, believing the land to be of nonmineral character, were disenfranchised by the withdrawal. To remedy that disenfranchisement while preserving the value of coal for future use of the United States, Congress enacted the 1909 Act. That act permitted existing good faith agricultural entrants whose land had been subject to the 1906 withdrawal to receive patents for those lands subject only to a "reservation to the United States of all coal in said lands." 30 U.S.C. § 81. In 1910, Congress enacted a similar statute for the protection of prospective agricultural entrants to federal lands. Under the protection of these Acts, the Amoco defendants' predecessors in interest claimed patents to land subject only to the reservation of coal in the United States.
 
 
 25
 Homesteading and mineral exploration proceeded under these statutes until 1934, when Congress changed its policy toward Indian Tribes and passed the Indian Reorganization Act (IRA), 25 U.S.C. §§ 463-479, which restored to tribal ownership some lands previously taken by the federal government. Congress provided that "[t]he Secretary of the Interior, if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation opened before June 18, 1934," subject to any outstanding rights or claims. Id. § 463(a). In 1938, pursuant to the 1934 Act, equitable title to coal held by the federal government on the Southern Ute Reservation was returned to the Tribe, subject to outstanding homestead patents. Amoco Prod. Co., 874 F.Supp. at 1151.
 
 2. Analysis
 
 26
 With this background, we turn to the general intent behind the 1909 and 1910 Acts. Defendants argue and the district court agreed, Amoco Prod. Co., 874 F.Supp. at 1155-59, that, in attempting to preserve coal lands for the benefit of the public as a whole and to remedy the negative impacts of the 1906 land withdrawals, Congress specifically considered and rejected a broad reservation of all minerals. From that rejection, defendants contend, we should infer that Congress knowingly chose the most narrow possible meaning of coal. Defendants rely on a passage of debate between a member of the House of Representatives from Texas and the Chairman of the Committee on Public Lands concerning the intended mineral reservation:
 
 
 27
 Mr. STEPHENS of Texas. Could the gentleman better arrive at what he desires by only patenting the surface of the land and reserving all minerals, precious and otherwise?
 
 
 28
 Mr. MONDELL. That has been discussed at some length, and the Committee on Public Lands is not of the opinion that that ought to be done. We believe this is quite a sufficient departure from the past practice of the Government. The lands which this legislation will affect are lands which the department has claimed contain some coals of value.
 
 
 29
 43 CONG. REC. 2504 (1909) (emphasis added). Even bearing in mind the admonition that legislative history should be treated cautiously, Exxon Corp. v. Lujan, 970 F.2d 757, 761 (10th Cir.1992), it is clear that Congress recognized in 1909 it had the option to reserve "all minerals" and rejected that option.
 
 
 30
 Congress' rejection of an "all minerals" reservation, however, does not inform us about Congress' intent regarding the extent of the reservation of a single substance, "coal." Moreover, the quoted exchange between Representatives Stephens and Mondell does not bear the weight defendants would have us give it because the Committee affirmatively considered and rejected several other options, including no reservation of coal. Aplt.'s App., vol. VI at 1275, Hearings on Coal Lands and Coal-Land Laws of the United States Before the House Committee on Public Lands, 59th Cong., 2d. Sess. 17 (Dec. 17, 1906) (hereinafter Hearings ) (statement of Edgar E. Clark) (considering the use of government-imposed railroad rates to retain control of coal supply). The Committee also discussed and rejected the possibility of retaining only ownership of coal which was marketable in 1907. Aplt.'s App., vol. VI at 1286, Hearings, at 15 (Jan. 9, 1907) (statement of Marius R. Campbell); id. at 1281 (noting that the western coals at issue in this case were not mineable at that time and were "inferior to the eastern coals, particularly from a steaming and coking standpoint").
 
 
 31
 Rather than adopt any of those options, Congress chose to reserve "all the coal." Id. at 1287 (The "only really effective way to retain the balance of the coal in the public domain in public ownership ... [was to] reserve the coal under the surface of all of the land. That would effectively retain in public ownership all the coal."). In so doing, the Committee was specifically informed it would retain coal that was not presently valuable, but which could become valuable in the future. Id. at 1281 ("[W]hat may not be coking [valuable] coal to-day may be coking coal to-morrow; because there are improvements going on."); id. at 1282 ("these [coals] may have a much greater value in the future").
 
 
 32
 It is apparent from the legislative history of the 1909 and 1910 Acts that Congress understood it had the option to reserve to the United States only coal having current economic value, and rejected that narrow mineral reservation. Congress knew there was indeterminate potential value in the reserved coal and intended to secure that value for the United States.[12] Rather than indicating a limited reservation of coal to the United States, the legislative history suggests that Congress adopted an interpretation of coal which encompassed both the present and future economic value of coal, including value that could only be realized through advances in technology such as those which drive the present day exploration for CBM.
 
 
 33
 Congress' broad general intent and the absence of a clear conveyance of CBM to the surface patentees,[13] coupled with the principle of statutory construction that resolves ambiguity in favor of the sovereign, persuades us that CBM was reserved to the United States.
 
 3. Related Statutes
 
 34
 Our conclusion that the reservation of coal should include CBM is buttressed by the interpretation given to analogous statutory mineral reservations. The same principle we rely on here, that ambiguity or uncertainty in the terms employed in land grants should be resolved in favor of the government, has been a subtext in the interpretation of many similar statutes reserving minerals to the United States.
 
 
 35
 In 1914, Congress enacted the Agricultural Entry Act, 30 U.S.C. §§ 121-125 (hereinafter the 1914 Act), reserving "phosphate, nitrate, potash, oil, gas, or asphaltic minerals" to the United States, id. § 121. Then in 1916, Congress enacted the Stock-Raising Homestead Act, 43 U.S.C. §§ 291-301 (hereinafter the 1916 Act), which reserved to the United States "all the coal and other minerals," id. § 299. Uniformly, courts have treated these mineral reservations expansively. Western Nuclear, Inc., 462 U.S. at 60, 103 S.Ct. at 2231-32 ("gravel is a mineral reserved to the United States in lands patented under" the 1916 Act); Aulston, 915 F.2d at 585 (reservation of "gas" in the 1914 Act includes carbon dioxide); Union Oil Co., 549 F.2d at 1279 (geothermal energy included in 1916 Act's reservation of "all the coal and other minerals"); Brennan v. Udall, 379 F.2d 803, 804 (10th Cir.1967) (oil shale included in 1914 Act reservation of oil). Although the language employed in the 1914 and 1916 reservations is more expansive and admits more variety in type and character of mineral reservation than the language used in the 1909 and 1910 Acts, judicial interpretations of these statutes have reached for the outer limits of reasonable construction in favor of the sovereign. A particularly notable example is one court's classification of geothermal energy (hot water and steam) as a "mineral." Union Oil Co., 549 F.2d at 1279. In fact, we have found no occasion in which a reservation of a mineral asset to the United States has been treated narrowly to exclude a newly appreciated value associated with that mineral; the cases cited above offer no support for doing so now.
 
 
 36
 In addition to the general principles of statutory construction on mineral reservations, we also have some specific guidance from Congress on the interpretation of the 1909 and 1910 Acts. In 1955, to aid exploration and extraction of uranium and other source materials[14] in coal reserved to the United States by the 1909 and 1910 Acts, Congress enacted legislation to control "Entry and Location on Coal Lands on Discovery of Source Material." 30 U.S.C. §§ 541-541i (hereinafter the 1955 Act). The 1955 Act granted to the patent holder of lands in which the United States reserved a coal interest the "exclusive right to mine, remove, and dispose of lignite [coal] containing ... source material [uranium and other similar minerals] ... subject to the reporting and payment requirements of section 541." Id. § 541c. The right to extract coal to obtain uranium was granted for all federal coal lands, "except [ ] lands embraced within a coal prospecting permit or lease." Id. (emphasis added).
 
 
 37
 The Amoco defendants consider the legislative history of the 1955 Act relevant to our determination of CBM ownership. They quote a 1955 House Report which discusses the rights of surface patent holders who acquired their interests under the 1909 and 1910 Acts:
 
 
 38
 The entryman or owner of any land, ... with respect to which only the coal deposits have been reserved to the United States, heretofore has been presumed to have possessed fee simple title to all other minerals in the land, including valuable source minerals, regardless of the host material or the mode of occurrence.
 
 
 39
 H.R. R EP. No. 84-1478 (1955), reprinted in 1955 U.S.C.C.A.N. 2992, 2996. Amoco argues this legislative history supports their contention that, in 1955, Congress recognized the right of surface patent holders to exploit minerals contained in coal, and therefore the right to exploit CBM must be similarly granted to surface patent holders.[15]
 
 
 40
 First, Amoco's assertion that the surface patent holder has the right to "all other minerals" begs the question of whether CBM is a mineral distinct from coal. Moreover, Amoco's interpretation of the legislative history of the 1955 Act is not the only interpretation the enactment will bear. We think the legislative history of the Act merely acknowledges a presumption that surface patent holders generally had the right to extract source minerals. The fact that Congress ultimately decided it must pass a statute to grant the surface patentees rights to uranium suggests that Congress did not believe the presumption extended to source minerals contained in federally owned coal. Moreover, Congress granted no right to extract uranium from coal where the United States had previously conveyed a coal lease. 30 U.S.C. § 541c. Congress' protection of existing coal leases also suggests that the 1955 Congress viewed the reservation of coal under the 1909 and 1910 Acts to encompass minerals such as uranium imbedded in coal.
 
 
 41
 The 1955 Act comports with a Congressional view that an imbedded mineral like uranium was part of the 1909 and 1910 Act coal reservations. That view applies with even greater force to integral components of coal like CBM, and if anything, convinces us that the 1955 Congress would resolve doubts regarding the 1909 and 1910 coal reservations, as we have here, in favor of the sovereign.[16]
 
 4. Summary
 
 42
 In summary, the direct legislative history of the coal lands acts indicates that Congress intended a reservation of coal that encompassed both the present and future economic value of coal. Congress was aware that full economic realization of that benefit would require advances in technology. Present day exploitation of CBM is a benefit of coal ownership that is consistent with Congress' general statutory intent. Given the limited value attributed to CBM in 1909 and 1910, we cannot infer that Congress intended to convey to the surface patent holder a component of coal which could not be severed from coal at the time of the statutes' enactments. In 1955, Congress itself recognized the supervening rights of coal owners in cases of dual mineral assets such as uranium and lignite. Lastly, courts have consistently construed mineral reservations in favor of the United States. These factors persuade us that Congress intended in the 1909 and 1910 Acts a broad definition of coal, and that CBM trapped in coal is included in the reservation of coal to the United States.[17]
 
 
 43
 At this juncture, our statutory interpretation is complete and we would normally conclude our analysis. But defendants raise one last issue regarding CBM ownership which demands our attention: the 1981 Department of the Interior Solicitor's Opinion.D. 1981 Department of the Interior Solicitor's Opinion
 
 
 44
 In 1981, the Solicitor of the Department of the Interior promulgated an opinion entitled Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits, 88 Interior Dec. 538 (1981) (hereinafter Solicitor's opinion), in which the Solicitor construed the meaning of "coal" in the 1909 and 1910 Acts and concluded that "a reservation of 'coal' does not include coalbed gas." Id. at 549. Although the district court determined that the statutes were unambiguous and that no resort to agency interpretation was necessary, Amoco Prod. Co., 874 F.Supp. at 1154, it nevertheless alternatively "grant [ed] deference to the 1981 Solicitor's opinion that Congress' use of the term coal does not include CBM gas," id. at 1160 (relying on Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).
 
 
 45
 On appeal, defendants contend we must defer to the Solicitor's "long-standing administrative interpretation and implementation of statutes the Department of Interior administers." Federal Br. at 27; see also Amoco Br. at 43. Amoco argues as if Chevron deference were automatic, covering all kinds of agency expressions of policy and interpretation regardless of the decisionmaking process, whether prospective or retroactive, or whether concerned with public lands or private rights. The Tribe counters that the instant case is an adjudication of private property rights and that the Solicitor's opinion is not entitled to Chevron deference because it was issued ex parte without the Tribe's involvement. We believe that the proper application of Chevron requires a discriminating analysis.
 
 1. The Opinion
 
 46
 After it became apparent that commercial recovery of CBM was economically feasible, the Department of the Interior sought to expedite the development of CBM on federal land. Before development could begin, however, it was necessary to resolve the unsettled question of CBM ownership. In instances where the United States had reserved all minerals (including coal, oil and gas), the government clearly owned the CBM. Where the United States held only a partial mineral estate, proposed development of CBM on federal land required clarifying whether ownership of CBM vested in the United States through its reservation of coal under the 1909 and 1910 Acts or through its reservation of oil and gas under the 1914 Act. As a subsidiary matter, it was also necessary to determine whether the right to extract federal CBM should be granted via an oil and gas lease or through a coal lease.
 
 
 47
 In 1981, the Solicitor of the Department of the Interior wrote a letter to the Secretary of the Interior offering a legal opinion on these questions; the letter was subsequently promulgated without notice and comment as a Solicitor's Opinion. 88 Interior Dec. at 539. To resolve the question of CBM ownership, the Solicitor construed the meaning of "coal" in the 1909 and 1910 Acts. Id. at 541-545.[18] Although he acknowledged the general canon that land grants are construed in favor of the sovereign and the fact that CBM had only recently become commercially severable from coal, the Solicitor nevertheless concluded that "a reservation of 'coal' [under the 1909 and 1910 Acts] does not include coalbed gas." Id. at 549. Accordingly, he determined that CBM interests were vested in the federal government through its oil and gas reservations. Id.
 
 
 48
 In making this determination, the Solicitor did not address the impact of his decision on the interests of private parties who had acquired ownership of coal, oil or gas by federal land patent prior to the issuance of the 1981 opinion, nor was any notice of the pending decision given to such owners.[19] If this opinion were accorded Chevron deference, it would have a retroactive impact on private rights conveyed by the government some seventy years earlier. The question we face is whether this is the sort of decision Chevron is meant to enshrine.[20]
 
 2. Chevron Deference
 
 49
 In Chevron, the Supreme Court considered whether an agency construction of a statutory term promulgated as an agency legislative rule should be binding on courts and citizens. Chevron, 467 U.S. at 840, 104 S.Ct. at 2780. The Court stated that to determine whether deference was due the agency's statutory construction, a court must first determine whether Congress has "directly spoken to the precise question at issue;" if so, an agency must follow the clearly expressed intent of Congress. Id. at 842-43, 104 S.Ct. at 2781. "The judiciary [as] the final authority on issues of statutory construction ... must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n. 9, 104 S.Ct. at 2781 n. 9. We have already held supra that Congress did not define the word coal in the 1909 and 1910 Acts and that Congress did not speak directly to the ownership of CBM.[21]
 
 
 50
 When Congress has not addressed "the precise question at issue," an agency requesting Chevron deference to its statutory interpretation must show that it has been delegated authority to address the question. Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990) (a "precondition to deference under Chevron is a congressional delegation of administrative authority"); Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 411 (7th Cir.1987) ("[T]he first question in determining the deference appropriate to the agency's construction is whether Congress has transferred discretion [to interpret the statute] to the agency.").
 
 
 51
 a. Delegation of Authority
 
 
 52
 The Department of the Interior has been expressly delegated authority over public lands. See 43 U.S.C. §§ 2, 1457; Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963) (Interior "has been granted plenary authority over the administration of public lands, including mineral lands."). As part of that authority, Interior has the right to promulgate regulations and to determine "the validity of claims against the public lands." Best, 371 U.S. at 336, 83 S.Ct. at 382. "[S]o long as the legal title remains in the government," Interior clearly has the " 'power, after proper notice and upon adequate hearing, to determine whether [a mining] claim is valid.' " Id. at 337, 83 S.Ct. at 383 (quoting Cameron v. United States, 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920)) (emphasis added); Nequoia Ass'n v. Department of the Interior, 626 F.Supp. 827 (D.Utah 1985) (Interior granted authority to determine validity of mining claims in National Parks under Mining in the Parks Act). For purposes of our analysis, we assume without deciding that Interior's power extends to the circumstances at issue here.[22]
 
 
 53
 b. The Format of Decisionmaking
 
 
 54
 To satisfy Chevron, the delegation of authority to form binding policy must include not only discretion to formulate interpretations but also discretion to utilize the particular format selected. See Robert A. Anthony, Which Agency Interpretations Should Bind Citizens and the Courts?, 7 YALE J. ON REG. 1, 4 (1990) (hereinafter Anthony) ("The touchstone in every case is whether Congress intended to delegate to the agency the power to interpret with the force of law in the particular format that was used."). After analyzing relevant Supreme Court cases, commentators Davis and Pierce have concluded "Chevron should be held to apply to the meanings agencies give statutes in all legislative rules and in most adjudications. [But][i]t should not be held to apply to agency pronouncements in less formal formats...." 1 KENNETH C. DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.5, at 119 (3d ed.1994).
 
 
 55
 This circuit has denied Chevron deference to agency policies promulgated in formats other than legislative rules or adjudications. Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1282 (10th Cir.1994) ( "[W]hile [an interpretive rule] may be entitled to some consideration in our analysis, it does not carry the force of law and we are in no way bound to afford it any special deference under Chevron.") (citations omitted). As we have unequivocally held, "[i]t is elementary administrative law that in order for [agency actions] to have binding force there are only two methods that an agency may use in formulating policy. It may establish binding policy either through rule-making procedures or through adjudications that create binding precedents." Amrep Corp. v. FTC, 768 F.2d 1171, 1178 (10th Cir.1985).[23]
 
 
 56
 Most circuits agree with our conclusion that Chevron deference is owed only to legislative rules and agency adjudications. See, e.g., Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation, 17 F.3d 521, 534-35 (2d Cir.1994) (denying Chevron deference to statutory interpretation promulgated in agency advisory circular after concluding that the advisory circular was not a "regulation" for the purposes of the Act at issue); Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 841-42 (6th Cir.1994) (distinguishing Chevron deference granted to agency legislative rules from lesser deference accorded policy statements and interpretive rulings); Satellite Broad. & Communications Ass'n of America v. Oman, 17 F.3d 344, 346-47 (11th Cir.1994) (according Chevron deference to formally promulgated legislative rule after previously declining to accord deference to similar policy decision); Travelstead v. Derwinski, 978 F.2d 1244, 1250 (Fed.Cir.1992) (noting general rule that agency pronouncements in formats less formal than legislative rules should be analyzed under Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), rather than Chevron ); Dalheim v. KDFW-TV, 918 F.2d 1220, 1228 & n. 39 (5th Cir.1990) (acknowledging application of Skidmore analysis to agency interpretive rules); cf. Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719, 736 (3d Cir.1989) (an agency policy statement "is entitled to no greater deference than any other policy statement, i.e., none") (citations omitted); Vietnam Veterans of America v. Secretary of the Navy, 843 F.2d 528, 537 (D.C.Cir.1988) ("A binding policy is an oxymoron."). See generally Atchison, Topeka & Santa Fe Ry. Co. v. Pena, 44 F.3d 437 (7th Cir.1994) (en banc) (Chevron deference owed where agency has rulemaking authority and follows notice and comment process but not where agency has no rulemaking authority), aff'd on other grounds, 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996) (holding text and structure of statute clear).[24]
 
 
 57
 According to the Department of the Interior's internal regulations, the Solicitor has authority:
 
 
 58
 To issue final legal interpretations, in the form of M-Opinions published in Decisions of the United States Department of the Interior, on all matters within the jurisdiction of the Department, which shall be binding, when signed, on all other Departmental offices and officials and which may be overruled or modified only by the Solicitor, the Under Secretary, or the Secretary.
 
 
 59
 Aplt.'s App., vol. IX at 2069. A Solicitor's opinion is issued at the personal discretion of the Solicitor, without notice and comment, and can be overruled or modified at any time. Id. at 1982, 2069. The opinion at issue here, although presented as authoritative statutory construction, is nothing more than a public pronouncement that Interior will not assert the federal government's right to CBM under its reservation of coal; in that context, the opinion is a valid and useful document. As a simple policy statement, however, the Solicitor's opinion fails to provide the procedural protections required for Chevron deference to attach.
 
 
 60
 [A] practice of routine acceptance for interpretations expressed in [informal] formats would, in abdication of judicial duties under Marbury, endow them with force of law where Congress did not intend them to have such force. By this process, the agency would bind the public without itself being bound by interpretations in these formats. And since these formats are exempt from APA public participation requirements, an especially odious frustration is visited upon the affected private parties: they are bound by a proposition they had no opportunity to help shape and will have no meaningful opportunity to challenge when it is applied to them.
 
 
 61
 Anthony, supra, at 57-58 (footnotes omitted and emphasis added).
 
 
 62
 Agencies can make law only in two formats, legislative rules and adjudications; the Solicitor's opinion was not promulgated with the procedural protections attendant to either format. Amrep, 768 F.2d at 1178. Accordingly, Chevron does not mandate that we give deference to the 1981 Solicitor's opinion.[25]
 
 3. Skidmore Consideration
 
 63
 Although Chevron deference to the Solicitor's opinion is clearly not warranted, we do assess the merits of that opinion to the extent suggested in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).
 
 
 64
 We consider that the rulings, interpretations and opinions of the [agency], ... while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
 
 
 65
 Id. at 140, 65 S.Ct. at 164; see also Headrick, 24 F.3d at 1282 (distinguishing between Chevron and Skidmore deference). There are several facets of this Solicitor's opinion, however, that impair its "power to persuade."
 
 
 66
 The Solicitor began his analysis of CBM ownership by noting the principle of resolving doubts in land grants in favor of the sovereign. While properly citing Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604, 617, 98 S.Ct. 2002, 2009-10, 56 L.Ed.2d 570 (1978), for this general principle on land grants, the Solicitor immediately qualified the application of that principle by asserting that land grants " 'are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication....' " Leo Sheep Co. v. United States, 440 U.S. 668, 682-83, 99 S.Ct. 1403, 1411, 59 L.Ed.2d 677 (1979) (quoting United States v. Denver & Rio Grande Ry. Co., 150 U.S. 1, 14, 14 S.Ct. 11, 15, 37 L.Ed. 975 (1893)). Apart from the basic premise that the principle of favoring the sovereign is involved when the legislative intent is in doubt, as here, the quoted qualification to the general rule arose in the context of grants under the Railroad Acts where the United States had offered land to railroads as an inducement to undertake track construction. Id. Since the situation involved here is not analogous to the facts of Leo Sheep, the principle of resolving doubts in favor of the sovereign applies with undiminished vigor. The Solicitor's conclusion on CBM ownership was determined without application of this governing canon.
 
 
 67
 The Solicitor further compromised his legal analysis by citing a state law case and suggesting that principles of common law conveyances lend support to his conclusion regarding ownership of CBM. 88 Interior Dec. at 544. Not only was the particular case on which the Solicitor relied overruled on appeal, United States Steel Corp. v. Hoge, No. 78-682 (Pa. Ct. C.P., Greene Cty., March 24, 1980), aff'd, 304 Pa.Super. 182, 450 A.2d 162 (1982), rev'd, 503 Pa. 140, 468 A.2d 1380 (1983), but cases construing common law conveyances are inapposite to the case at bar as we have discussed supra note 17.
 
 
 68
 The Solicitor's position on the statutory reservation of CBM is also inconsistent with Interior statements on coal made contemporaneously with the 1909 and 1910 Acts. In 1909 the United States Geological Survey, a branch of the Department of the Interior, recognized that gas trapped with coal is generated by the coalification process. Rollin T. Chamberlin, Notes on Explosive Mine Gases and Dust, U.S. Geol. Surv. Bull. 383, H.R. DOC. NO . 59-823, at 16 (1909). This contemporaneous statement acknowledging the shared genesis of coal and CBM belies the Solicitor's simplistic conclusion that in 1909 Congress believed that coal was a "solid rock." The Solicitor's narrow construction of coal in the 1909 and 1910 Acts is also inconsistent with the position Interior has taken in other similar mineral reservation disputes. As we have noted supra, Interior has typically construed such mineral reservations broadly. See Aulston, 915 F.2d at 595; Brennan v. Udall, 379 F.2d at 804; see also 1 CURTIS H. LINDLEY, AMERICAN LAW RELATING TO MINES AND MINERAL LANDS § 96, at 169 ("the word 'mineral,' as used in these various acts, should be understood in its widest signification"). On the few occasions in which a mineral term has been interpreted narrowly, courts have rejected those interpretations. See, e.g., Western Nuclear, Inc., 462 U.S. at 42, 45, 103 S.Ct. at 2222-23, 2224 (rejecting Circuit Court's reliance on 1910 Department of the Interior determination that gravel is not a mineral in favor of more recent expansive definitions of the term); Union Oil Co., 549 F.2d at 1279-80 & n. 19 (rejecting Department of the Interior letter opinions suggesting that geothermal steam is not a mineral within the meaning of the Stock-Raising Homestead Act).
 
 
 69
 Moreover, the opinion has a number of factual limitations that militate against applying it here. The opinion is titled "Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits." 88 Interior Dec. 538 (1981). It thus only purports to govern the disposition of present federal land interests, not the interests of private parties, such as are at issue in this case. The opinion also explicitly refuses to "warrant title to any oil and gas deposit." Id. at 549. The Solicitor thereby concedes that it is beyond the scope of the opinion to settle disputed property rights. It is only now, over a decade after the issuance of the opinion, that the Amoco defendants and the Department of the Interior suggest that private parties like the Tribe should be swept within the opinion's net and that their ownership of CBM was finally settled by its rationale. These assertions reach well beyond the scope of the original opinion.
 
 
 70
 Finally, we are convinced that the Solicitor's statutory interpretation of the 1909 and 1910 Acts is arbitrary. Even under the deference mandated by Chevron, "legislative regulations are [not] given controlling weight [if] they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 844, 104 S.Ct. at 2782. "Review under the 'arbitrary and capricious' tag line ... encompasses a range of levels of deference to the agency." American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 4 (D.C.Cir.1987). "In ... typical reviews, ... we must consider whether the agency's decisionmaking was 'reasoned.' " Id. at 5 (citation omitted). An agency decision which is not reasoned persuades no more than it controls. Reasoned decisionmaking considers "relevant factors" and explains the " 'facts and policy concerns.' " Id. (citation omitted). While the Solicitor recognized that CBM is always present in solid rock coal and is only "potentially" but not naturally severable from coal, he nonetheless concluded that a reservation of coal excludes CBM. 88 Interior Dec. at 540. By failing to explain how Congress could have intended to convey a substance neither known to be valuable nor severable at the time of the enactments, the Solicitor's opinion failed to consider facts which might have significantly affected its decisionmaking. Reasoned decisionmaking does not omit without explanation potentially determinative factors.
 
 
 71
 Thus, we are not persuaded we should defer to the Solicitor's opinion.[26] The general congressional intent of the 1909 and 1910 Acts to reserve to the United States all the benefits of the coal resources controls the determination of CBM ownership. We hold that ownership of CBM, an integral component of coal inseverable at the time of the 1909 and 1910 enactments, is vested in the Tribe as owners of the coal resource.
 
 III.
 
 72
 The district court concluded that the class action defenses to the Tribe's assertion of CBM ownership were mooted by its determination of CBM ownership in the Amoco defendants. Amoco Prod. Co., 874 F.Supp. at 1161. Consequently, the court did not address the issues raised by the common defenses. Id. Because we reverse the district court on the threshold issue of CBM ownership, further proceedings will be required for resolution of these issues.
 
 
 73
 As we mentioned at the outset, the federal defendants joined with the Amoco defendants on the issue of CBM ownership. They also asserted that the statute of limitations contained in 28 U.S.C. § 2401(a) precludes the Tribe's claim of breach of fiduciary duty against them. Because the district court granted the federal defendants' motion for summary judgment on breach of fiduciary duty to manage the CBM based on its finding CBM ownership in the Amoco defendants, it never reached the statute-of-limitations issue as applied to the federal defendants. Amoco Prod. Co., 874 F.Supp. at 1161. Further proceedings will also be required on this issue on remand.[27]
 
 IV.
 
 74
 For all the foregoing reasons, we hold that the Southern Ute Indian Tribe, as successor in interest to coal reserved to the United States by the Acts of 1909 and 1910, is the owner of coal bed methane contained in that coal. Accordingly, we REVERSE the district court's grant of summary judgment in favor of defendants and remand for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Frank M. Coffin, United States Senior Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 Our reversal will require the district court to address the defenses asserted by defendants to preclude recovery by the Tribe, at least some of which appear to raise issues of serious magnitude
 
 
 [2]
 The district court certified its judgment for immediate appeal under Fed.R.Civ.P. 54(b)
 
 
 [3]
 We consider infra part II D, and reject, defendants' alternative argument that if Congress' intent is not clearly expressed we must defer to the Department of the Interior's statutory construction
 
 
 [4]
 In full, the Act states:
 Any person who has in good faith located, selected, or entered under the nonmineral land laws of the United States any lands which subsequently are classified, claimed, or reported as being valuable for coal, may, if he shall so elect, and upon making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which shall contain a reservation to the United States of all coal in said lands, and the right to prospect for, mine, and remove the same. The coal deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal-land laws in force at the time of such disposal, but no person shall enter upon said lands to prospect for, or mine and remove coal therefrom, without the previous consent of the owner under such patent, except upon such conditions as to security for and payment of all damages to such owner caused thereby as may be determined by a court of competent jurisdiction. The owner under such patent shall have the right to mine coal for use on the land for domestic purposes prior to the disposal by the United States of the coal deposit. Nothing herein contained shall be held to affect or abridge the right of any locator, selector, or entryman to a hearing for the purpose of determining the character of the land located, selected, or entered by him. Such locator, selector, or entryman who has made or shall make final proof showing good faith and satisfactory compliance with the law under which his land is claimed shall be entitled to a patent without reservation unless at the time of such final proof and entry it shall be shown that the land is chiefly valuable for coal.
 30 U.S.C. § 81 (emphasis added).
 
 
 [5]
 The federal defendants have adopted the Amoco defendants' arguments on the issue of CBM ownership. Federal Br. at 28
 
 
 [6]
 Adsorption is "adhesion in an extremely thin layer of molecules ... to the surfaces of solid bodies or liquids." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 16 (10th ed.1993)
 
 
 [7]
 At issue here is the ownership of CBM trapped in and produced from the coal reservoir. We do not address ownership of CBM generated by the coalification process that may have migrated away from the coal into adjacent non-coal strata
 
 
 [8]
 A gas is "a fluid substance with the ability to expand indefinitely." THE RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 550 (1995). CBM which, as here, cannot expand without inducing a physical change in its reservoir, cannot be considered a natural gas in the typical sense
 
 
 [9]
 Adsorbed CBM, which comprises most of the "gas" within coal, can be economically produced only by techniques which artificially induce changes in the coal reservoir. See, e.g., Jeff L. Lewin et al., Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane, 94 W. VA. L.REV. 563, 573, 576-583 (1992) (discussing vertical-boreholeinduced pressure changes, hydrofracturing, and horizontal drilling)
 
 
 [10]
 In fact, by 1909, scientists understood that gas within coal was a constituent of coal which was generated by the coalification process. See Rollin T. Chamberlin, Notes on Explosive Mine Gases and Dust, U.S. Geol. Surv. Bull. 383, H.R. DOC. NO . 59-823, at 16 (1909) ("The ultimate source of the gases [within coal] ... has arisen from the slow decomposition of organic matter as a by-product in the process which has converted vegetable humus into coal.")
 
 
 [11]
 Congress almost certainly knew in 1909 that gas could be extracted from coal. The coal degasification practiced in 1909 was, however, a different process than the CBM drilling at issue in this case. Coal degasification required mining and extraction of coal, then releasing the gas by mechanically crushing the coal, Chamberlin, supra note 10, at 17, or heating it, LARRY L. ANDERSON & DAVID A. TILLMAN, SYNTHETIC FUELS FROM COAL § 3.1.1, at 31 (1979). Because these processes of degasification necessarily resulted in damage to or destruction of the coal, they could only be employed by the owner of the coal. Accordingly, the value of the gas extracted necessarily belonged to the coal owner. CBM drilling, on the other hand, for the first time allows CBM to be released from coal without bringing large volumes of coal to the surface. The technique is typically employed where the coal is deeply buried and thinly bedded and cannot be economically mined. The advent of the drilling technologies employed today to extract CBM while leaving most of the coal relatively undisturbed, cf. Lewin, supra note 9, at 593-597 (the primary concern with CBM drilling is in situ damage to coal reserves), creates an apparent conflict in ownership of CBM that did not exist in 1909 and 1910
 
 
 [12]
 Moreover, we cannot believe that Congress would have countenanced ceding CBM to surface patentees, see infra note 13, knowing that degasification at the time would have involved damage to and possibly destruction of the very resource sought to be reserved. See supra note 11
 
 
 [13]
 "Surface patent" is used throughout this opinion to indicate the surface estate patented to agricultural entrants under the 1909 and 1910 Acts, which estate included all minerals other than coal
 
 
 [14]
 Source material, as used in the 1955 Act, means "uranium, thorium, or any other material which is determined by the Atomic Energy Commission ... to be source material." 30 U.S.C. § 541e. Source material is used in production of special nuclear material; a mineral is classified as source material if the Atomic Energy Commission determines that the material is "essential to the production of special nuclear material" and that the classification is in the "interest of common defense and security." 42 U.S.C. § 2091
 
 
 [15]
 Congress' allocation of the right to extract uranium in coal cannot be fully equated to the CBM at issue in this case because uranium is not invariably included in coal as part of the coalification process and because the 1955 Act does not purport to apply to nonfederal lands. Congress' determination of the respective rights of the surface patent holder and the United States in the 1955 Act is nevertheless instructive in the case at bar. See Andrus v. Shell Oil Co., 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980) ("[W]hile arguments predicated upon subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may consider in the search for legislative intent.")
 
 
 [16]
 Amoco also relies on a 1933 House of Representatives' report to suggest that Congress has recognized dual ownership between the United States and agricultural patent holders when reserved minerals are found commingled with unreserved minerals. Amoco Br. at 23-24 (citing H.R. REP. NO . 72-1938, at 2 (1933)). The House report and the subsequently enacted 1933 Act, which consolidated in the United States ownership of commingled sodium and potash, 30 U.S.C. § 124, do not particularly inform us about the 1909 and 1910 coal reservations, and certainly do not persuade us to ignore our mandate to resolve doubts and ambiguities in the 1909 and 1910 coal reservations in favor of the sovereign
 
 
 [17]
 The Tribe, the Amoco defendants, and the federal defendants have cited state court cases which have considered ownership of CBM. As interesting as these cases are (four of five deciding ownership of CBM is in the coal owner), they are not dispositive of the case at bar. The state cases construe CBM ownership in the context of common law deeds, which are negotiated conveyances with specific rules and presumptions of construction. These cases ultimately have little to offer in terms of our interpretation of Congressional intent in the 1909 and 1910 Acts. See, e.g., NCNB Texas Nat'l Bank, N.A. v. West, 631 So.2d 212 (Ala.1993) (coal owner has ownership rights of CBM contained in coal and gas owner had rights to any CBM which has migrated away from the coal reservoir); Vines v. McKenzie Methane Corp., 619 So.2d 1305 (Ala.1993) (ownership of CBM was included in grant of "all coal"); Rayburn v. USX Corp., No. 85-G2661-W, 1987 U.S. Dist. LEXIS 6920 (N.D.Ala. Jul. 28, 1987) (coal owner, USX, is owner of right to explore for and to extract occluded CBM where grantor of deed retained only oil and gas rights); United States Steel Corp. v. Hoge, 503 Pa. 140, 468 A.2d 1380 (1983) (coal owner has right to CBM). But cf. Carbon County v. Union Reserve Coal Co., 271 Mont. 459, 898 P.2d 680 (1995) (right to extract CBM is with holder of gas exploration rights)
 
 
 [18]
 To determine whether federal rights to CBM resulted from federal ownership of coal or from federal ownership of oil and gas, the Solicitor began by noting the current interest in developing this resource in light of the recently achieved technical feasibility. He then examined the physical characteristics of coal and CBM. Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits, 88 Interior Dec. 538, 540 (1981). Next he reviewed the history of coal land withdrawals and coal reservations. Id. at 540-41. He observed that in 1909 and 1910 coalbed gas was both a nuisance and a hazard. Id. at 541. He relied on the colloquy between Congressman Mondell and Stephens to indicate the limited nature of the coal reservation, and concluded that the statutory language of the coal lands Acts and the legislative history "belie the argument" that Congress intended to reserve any mineral other than coal. Id. at 542. The Solicitor used subsequent legislation (the 1955 and 1933 Acts) and a case considering a common law deed to support his conclusion. Id. at 542-44
 
 
 [19]
 We note that after the issuance of the 1981 Solicitor's opinion at issue in this case, the Department of the Interior promulgated an opinion regarding the rights to CBM on the Jicarilla Apache Reservation. Rights to Coalbed Methane Under an Oil & Gas Lease for Lands in the Jicarilla Apache Reservation, 98 Interior Dec. 59 (1990). Although the 1990 opinion relies on the 1981 Solicitor's opinion for its statutory interpretation, and thus has little to offer in terms of guidance on the 1909 and 1910 Acts, it does represent the first time Interior attempted to apply the reasoning of the 1981 Solicitor's opinion to Indian land. Some important differences exist between the Jicarilla opinion and this case. The Jicarilla Apache Tribe owns all relevant mineral resources on its reservation (coal, oil and gas). Aplt.'s App., vol. IX at 2026. Thus, the determination that an oil and gas lease is an effective instrument to lease CBM gas is merely an interpretation of a federal lease form, not a final determination of Tribal property rights. We accept that an oil and gas lease executed by the owner of CBM, in the absence of a specific reservation of CBM, could be an effective instrument to convey the right to drill and produce CBM. Shoshone Indian Tribe v. Hodel, 903 F.2d 784, 787 (10th Cir.1990) ("The Secretary is delegated the authority to define the terms of the leases and to 'make such rules and regulations as may be necessary for the purpose of carrying the provision of [the] section into full force and effect ....' " (quoting The Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396))
 
 
 [20]
 Although we address the issue of Chevron deference, we note that neither Amoco, the oil industry at large, nor the Department of the Interior have previously assumed the Solicitor's opinion resolved private CBM property rights, as Amoco now advocates it should. Internal Amoco memoranda indicate Amoco has been aware since 1980 that ownership of CBM was unsettled, Aplt.'s App., vol. VII at 1412 (Amoco legal opinion on CBM ownership), and has known since 1982 that the Solicitor's opinion was not a binding determination of property rights, id. at 1429-1441 (Amoco business risk assessment). Amoco was also in receipt of a 1985 title opinion which concluded that the determination of CBM ownership based on the Solicitor's opinion was only "tentative" because the opinion was "subject to revision and revocation." Id. at 1444. Commentators on the issue of CBM ownership have also noted the non-binding nature of the Solicitor's opinion. J. Hovey Kemp & Kurt M. Petersen, Coal-Bed Gas Development in the San Juan Basin: A Primer for the Lawyer and Landman, 1988 ROCKY MTN. ASS'N OF GEOLOGISTS 257, 262. Similarly, after the issuance of the 1981 Solicitor's opinion, in an internal letter the Bureau of Indian Affairs, a branch of the Department of the Interior, recognized that the Southern Ute Tribe had a claim to ownership of CBM. Aplt.'s App., vol. IX at 2024
 
 
 [21]
 We also concluded supra that Congress' general intent regarding the 1909 and 1910 coal reservation is clear: Congress intended a broad definition of coal which could encompass CBM. Some courts have indicated that Congressional intent sufficient to satisfy the first step of Chevron can be discerned using traditional methods of statutory construction. INS v. Cardoza-Fonseca, 480 U.S. 421, 446-448, 107 S.Ct. 1207, 1221-22, 94 L.Ed.2d 434 (1987); United States v. LaBonte, 70 F.3d 1396, 1406 (1st Cir.1995) ("When the plain meaning of a law is not readily apparent on its face, the next resort is to the traditional tools of statutory construction--reviewing legislative history and scrutinizing statutory structure and design--in an effort to shed light on Congress's intent."), rev'd on other grounds 520 U.S. 751, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (concluding statute unambiguous); see also Cass R. Sunstein, Law and Administration after Chevron, 90 COLUM. L.REV. 2071, 2109 (1990) (arguing that general Congressional intent garnered from the "legislative history or background of the statute, or from understandings about likely legislative desires," is sufficient to foreclose reliance on a contrary agency statutory interpretation) (emphasis added). But see Cardoza-Fonseca, 480 U.S. at 454-55, 107 S.Ct. at 1224-25 (Scalia, J., concurring) (suggesting that Justice Stevens, the author of Chevron, writing for the Court in Cardoza-Fonseca misinterpreted Chevron when suggesting that traditional tools of statutory construction can be used to supplant an agency statutory interpretation if the agency has otherwise appropriately been delegated authority to make the interpretation)
 
 
 [22]
 It is far from clear that the agency's authority extends to the issue presented in the case at bar. Even if the Solicitor's opinion represents a legitimate exercise of its authority over federal property, the lands in question in this case are not federal. If Interior once had jurisdiction over these lands, it no longer does. Burke v. Southern Pac. R.R. Co., 234 U.S. 669, 697, 34 S.Ct. 907, 918, 58 L.Ed. 1527 (1914) (After a " 'patent issued, that was the end of the jurisdiction of the Department over the lands.' " (quoting Secretary of the Interior)). The jurisdiction of the Department of the Interior after the issuance of land patents has always been viewed as limited:
 The limit of its authority is found in the acts of congress. It cannot grant land.... It cannot take away the property of one and give it to another.... Its jurisdiction terminates and its authority ceases when the land passes into private ownership and the title of the government is transmitted through the forms of law.
 
 
 [2]
 CURTIS H. LINDLEY, AMERICAN LAW RELATING TO MINES AND MINERAL LANDS § 664, at 1656 (Fred B. Rothman & Co. photo. reprint 1988) (3d ed.1914). A statutory delegation of authority would be required for Interior to have the power to re-assert jurisdiction over lands after patent issuance, and no such delegation has been made. See, e.g., Foust v. Lujan, 942 F.2d 712, 714-15 (10th Cir.1991) (noting specific grant of authority to Interior by the Federal Land Policy and Management Act to correct mistakes of fact after patent issuance, but no grant of authority to correct other patent problems like mistakes of law)
 In a situation similar to the present case, Congress conveyed by statute the United States' interest in uranium contained in coal reserved by the 1909 and 1910 Acts. 30 U.S.C. §§ 541-541i. Clearly, Congress neither expressly nor implicitly delegated power to Interior to determine that coal-ownership question. Moreover, Congress left to local courts resolution of disputes between patent holders and private parties (like the Tribe) who are successors in interest to the 1909 or 1910 Act coal reservations. H.R. REP. No. 1478 (1955), reprinted in 1955 U.S.C.C.A.N. 2992, 2996 ("[C]onflicts of interests [over the right to extract uranium and other source material from the coal] should be resolved by the parties concerned or, failing that, by the local courts and not through legislation."); cf. Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990) (Where Congress has "expressly established the Judiciary and not the [administrative agency] as the adjudicator of private rights of action arising under the statute," the "precondition to deference under Chevron [of] a congressional delegation of administrative authority" is not met.).
 Thus, although the Department of Interior clearly has authority to administer public lands, Interior has not demonstrated that it has been delegated authority to decide which lands are public, or to bind private parties after issuance of federal patents to its statutory interpretation. Because for other reasons we are not required to give Chevron deference to the Solicitor's opinion, we need not decide whether we would otherwise decline to defer to the Solicitor's opinion on the ground that Interior was not delegated authority over the kind of dispute we have here.
 
 
 [23]
 It is sometimes difficult to distinguish legislative rules from policy statements. Davis and Pierce have described the differences in this way:
 There are three main differences between a legislative rule and a general statement of policy. First, except in specified circumstances, an agency cannot promulgate a legislative rule without first following notice and comment procedures; by contrast, APA § 553(b) specifically exempts general statements of policy from notice and comment procedures. Second, a valid legislative rule has the same binding effect as a statute; a general statement of policy has no binding effect on members of the public or on courts. A general statement of policy also is not judicially enforceable against an agency.... Third, many legislative rules are subject to potential judicial review before they are applied in a particular case; most general statements of policy are not subject to judicial review in the abstract.
 
 
 [1]
 KENNETH C. DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.2, t 228 (3d ed.1994) (internal citation omitted)
 
 
 [24]
 Such confusion as exists within or between the circuits regarding whether Chevron deference is due informally promulgated agency statements can be attributed to the Supreme Court's loose invocation of Chevron terminology. See generally 1 DAVIS & PIERCE, § 3.6. Thus, the Court has sometimes cited Chevron in cases where Chevron deference was not actually granted. For example, in Reno v. Koray, 515 U.S. 50, 58-62, 115 S.Ct. 2021, 2026-27, 132 L.Ed.2d 46 (1995), the Court, citing both the Chevron and the Skidmore line of cases, see infra part II D 3, gave "some" deference to the Bureau of Prisons' statutory interpretation promulgated in an internal agency guideline. The Third Circuit subsequently used the Supreme Court's citation to justify granting Chevron deference to informally promulgated agency statutory interpretation. Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 182 (3d Cir.1995) (citing Koray, 515 U.S. at 58-59, 115 S.Ct. at 2026-27). But as Judge Nygaard pointed out in dissent, the Court in Koray only agreed with the agency interpretation because it was the most natural reading of the statute in question, not because Chevron mandated that it defer to an informally promulgated agency interpretation. Id. at 193-94 (Nygaard, J. dissenting)
 
 
 [25]
 Defendants contend we must give Chevron deference to this Solicitor's opinion because we have given deference to other such opinions in the past. Cases in which we granted some deference, however, are readily distinguishable from this one. In Aulston v. United States, for example, we decided that a 1914 reservation of "gas" to the United States included carbon dioxide. Aulston v. United States, 915 F.2d 584, 585 (10th Cir.1990). The dispute arose between the United States, as holder of the gas estate, and the agricultural patentee. Id. The United States had granted an oil and gas lease, which it said included the right to explore for carbon dioxide gas. Id. at 587. The case came before this court as an appeal from an Interior Board of Land Appeals (IBLA) decision. Id. at 588. After conducting our own analysis of the 1914 statutes, we determined that a Department of the Interior interpretation of "gas" in the Mineral Lands Leasing Act (MLLA), a related statute, was due "some consideration" by the court, and that "some deference" to Interior's interpretation of the 1914 Act was appropriate in review of the IBLA decision. Id. at 596. In so holding, we rejected less formal Department of the Interior internal memoranda promulgated without the procedural protections of formal rulemaking or adjudications. Id. at 595 & n. 16. Even allowing that some deference was due the IBLA decision, we nonetheless were not persuaded that the decision was dispositive of the issue. We also relied on "[o]ther factors" to ensure that the interpretation of gas forwarded by the Department of the Interior was consistent with the purpose of the 1914 Act. Id. at 599. Aulston is thus a case which rejected informally promulgated statutory interpretations, involved federal rather than private land interests, and reached this court from an agency IBLA adjudication in which due process was afforded the participants
 In Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 737 (10th Cir.1982), a pre-Chevron case, we were concerned with a trade association's challenge to the Department of the Interior's interpretation of the Federal Land Policy and Management Act of 1976, issued initially in a Solicitor's opinion, as the Act related to oil and gas activity on federal lands under lease. Subsequently, the relevant parts of the Solicitor's opinion were formally promulgated in a Wilderness Inventory Handbook and in Interim Management Policy and Guidelines, both after notice and comment procedures. Id. at 739 n. 6. Moreover, unlike the case at bar, the United States was the owner of the mineral resource and the issue was only the regulation of that resource. In such circumstances, Interior unquestionably has the authority to regulate in such a manner and we would naturally defer to its reasonable interpretation. See also Exxon v. Lujan, 970 F.2d 757 (10th Cir.1992) (granting Chevron deference to Interior decision to issue permit for transport of carbon dioxide gas under the Mineral Leasing Act rather than under FLPMA in an appeal from an IBLA decision where due process was afforded participants and Interior unquestionably administers both statutes); Brennan v. Udall, 379 F.2d 803 (10th Cir.1967) (recognizing mandatory deference to reasonable Department of the Interior conclusion that oil shale was included in reservation of oil to the United States, where the United States owned the reserved mineral interests, where the successor in interest to the agricultural patentee voluntarily submitted the dispute to Interior adjudication, where Interior's position on oil shale had been a matter of public record for fifty years, and where reservation of oil shale could have been contested prior to patent issuance).
 
 
 [26]
 Although we hold that no deference is due the Solicitor's opinion as it relates to the determination of private CBM ownership, we do not address the degree of deference due the opinion as applied to ownership of federal land interests, to regulation and use of mineral assets on federal lands, or to interpretation of federal lease forms
 
 
 [27]
 To the extent the federal defendants' statute of limitations argument relies on the 1981 Solicitor's opinion to provide notice to the Tribe and to initiate the accrual of time, we note that such notice may be legally insufficient in light of our holding that the Solicitor's opinion is not binding on the issue of Tribal CBM ownership. Limerick Ecology, 869 F.2d at 735 (parties have no obligation to challenge an opinion which is non-binding); Utah v. United States, 624 F.Supp. 622, 625-26 (D.Utah 1983) (limitations period did not expire on State of Utah's claim against the United States where only notice to Utah was non-binding Department of the Interior Regional Solicitor's opinion that conflicted with Secretary of the Interior's letter opinion), aff'd, 780 F.2d 1515 (10th Cir.1985), rev'd on other grounds sub nom. Utah Div. of State Lands v. United States, 482 U.S. 193, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987). We leave that determination to the district court as well